## STATE OF CONNECTICUT *v.* STEVEN GARY
### (SC 16680)

Sullivan, C. J., and Norcott, Katz, Palmer and Zarella, Js.

Argued December 6, 2004—officially released April 19, 2005

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael Pepper*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. A jury found the defendant, Steven Gary, guilty of murder in violation of General Statutes § 53a-54a (a),[1] carrying a pistol without a permit in violation of General Statutes § 29-35[2] and criminal pos-

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his or her person . . . without a permit to carry the same issued as provided in section 29-28. . . ." The offense in the present case was committed in 2000. Section 29-35 has been amended several times since then for purposes not relevant to this appeal.

session of a firearm in violation of General Statutes § 53a-217 (a) (1)[3] and the trial court rendered judgment in accordance with the verdicts. The defendant appeals from the judgment of conviction for murder[4] claiming that: (1) there was insufficient evidence for the jury reasonably to conclude beyond a reasonable doubt that he had the specific intent to kill; (2) the trial court improperly denied his motion for a mistrial when a juror informed the trial court after the verdict that he had doubts about the murder conviction; and (3) the trial court improperly denied his request for an evidentiary hearing to investigate potential juror misconduct. We affirm the judgment of conviction.

The following evidence was presented to the jury. Hector Santiago, a patrol officer with the New Haven police, testified that in the early morning hours of May 21, 2000, he and two other officers were patrolling the general area of the Live Wire Club (club) at 588 Ferry Street in New Haven. The club operates after 2 a.m. as an "after-hours" club at which dancing, but not drinking, is allowed. On May 21, 2000, approximately 150 to 200 people were waiting outside the club when it opened. After the club opened, Nathaniel Blackman, a police sergeant and Santiago's supervisor, arrived in his patrol car at approximately 3 a.m. As Santiago approached the car, leaned in the window and started to report the night's events to Blackman, Santiago heard what he described as a loud "clapping sound as if a balloon popped" coming from inside the club. Immediately

---

[3] General Statutes § 53a-217 (a) provides in relevant part: "A person is guilty of criminal possession of a firearm or electronic defense weapon when such person possesses a firearm or electronic defense weapon and (1) has been convicted of a felony . . . ." The offense in the present case was committed in 2000. Section 53a-217 has been amended since then for purposes not relevant to this appeal.

[4] Although the defendant originally appealed from his convictions on all counts, his brief to this court challenges only his murder conviction. Accordingly, we deem his challenge to the remaining convictions abandoned.

thereafter, a large number of people ran out of both the front and back doors of the club. Santiago heard some of the people saying that someone had been shot and immediately radioed the police dispatcher for more police officers. As he did so, he saw a woman holding her hands in front of her face and yelling, "[O]h my God, they shot him in the head." Santiago approached the woman and saw that she had blood on her. When he asked her if she was hurt, she responded that it was not her blood and said, "[H]e's in the back." Santiago and a number of other officers then entered the rear entrance of the club and saw a man lying on the floor. He had a bullet wound above his right eye and was not moving or able to speak. Santiago recognized the victim as Efraim Gilliard. Santiago asked the few people who were still inside the club to leave and called for medical assistance and police detectives. Medical personnel arrived and the victim was taken to Yale-New Haven Hospital.

William Farrell, a detective with the New Haven police department's bureau of identification, testified that the other members of the bureau arrived at the club at approximately 4:30 a.m. The detectives found the victim's clothing and personal items in the rear room of the club. The detectives also found a shell casing in an alcove near the rear door. The casing was an "RP 380" caliber. A "380" is a semiautomatic handgun and discharges the shell casing automatically when it is fired.

Luis Duarte was employed as a bouncer at the club. In the early morning on May 21, 2000, he was collecting money at the door of the club from club patrons who were waiting in two lines, one for men and one for women. After Duarte collected the money, each person was searched for weapons by one of several security personnel employed by the club. At about 2:30 a.m., Duarte had an altercation with a "couple of guys" who

had not been allowed to enter the club. Ultimately, they left the area. At about 3 a.m., Duarte heard a gunshot from inside the club and, immediately thereafter, saw people running out. Duarte lost sight of the men who had not been allowed to enter the club after he heard the gunshot. To Duarte's knowledge, no one entered the club with a weapon that night.

Craig Hines testified that he went to the club early in the morning on May 21, 2000, with the victim and Samuel Mabry. When he arrived, he saw the defendant outside the club. The club was extremely crowded, it was difficult to move around and strobe lights were flashing. Hines made his way to the back of the club, at which time he heard two gunshots. Hines testified that he "felt the pressure" of a bullet passing him. Although he was standing about three feet behind the victim when the shots were fired, he did not see the defendant, the gun or a muzzle flash.

Mabry testified that he went to the club with Hines and the victim early in the morning on May 21, 2000. They saw the defendant, who was a friend, outside the club. The defendant gave a gun to the victim, who concealed it in his crotch area. All of them entered the club through the front door. The victim was patted down for weapons but the gun was not found. After being admitted, the defendant, Mabry and the victim walked to the back of the club. Mabry heard the defendant ask the victim to return his gun, but did not see the victim give the gun to him and did not know that the defendant had the gun until after the shooting. When they arrived at the back of the club, a person unknown to Mabry and later identified as Jemar Sanders, started "talking trash" to the defendant. Mabry stepped between the defendant and Sanders and told the defendant to "leave it alone." When Mabry and the defendant then turned away from Sanders toward the front of the club, Sanders hit the defendant in the back of the head

with his fist. The defendant bent over and turned back toward Sanders. When he stood up he had a pistol in his hand and "took the shot." The bullet struck the victim. At the time of the shooting, Mabry had been between the defendant and Sanders and the victim had been standing to the side. Mabry was close enough to touch the defendant and the victim was two or three feet away and had grabbed Sanders. The defendant raised the gun to shoulder height before shooting it and the gun was about two feet from Mabry when it was fired. Mabry was interviewed by the police within days of the shooting and, when he was presented with an array of photographs, identified the defendant as the person who had shot the victim. Mabry told the police that the shooting had been accidental.

Sanders testified that he arrived at the club at about 2:30 a.m. on May 21, 2000. After paying the cover charge and submitting to a weapons search, he entered the club, went to the back and sat on a railing surrounding a stage area. The defendant walked by with three other people, and Sanders and the defendant exchanged provocative words. Sanders initially stood up to confront the defendant, but then sat down again. When the defendant continued to address him, Sanders stood up again. Mabry and the victim came between Sanders and the defendant and tried to restrain the defendant. As the defendant tried to reach Sanders, Sanders punched him in the face. The defendant then backed up and drew "a little gun . . . ." The gun fired immediately. Sanders testified that he was standing directly in front of the defendant but the gun "didn't get to . . . reach that way." The victim, who was standing between Sanders and the defendant, was struck by the bullet. It was so crowded in the club that it was hard to move, but Sanders "dove" under the people dancing on the stage and crawled and ran out of the club.

At some point after the shooting, the police came to Sanders' house and asked him about the shooting. When Sanders went to the police station with his mother, he told the police that he had not seen a gun in the defendant's hand and did not believe that the defendant had shot at him. He lied because he did not want to be known as a "snitch . . . ." Sanders testified that he was now telling the truth because "the kid took the bullet for me" and he felt that it was his fault.

Ramona Holloway and Danielle Burke testified as defense witnesses. Holloway testified that she went to the club in the early morning on May 21, 2000, with two friends, Burke and Sherrie Thomas. At some point, Holloway saw an altercation involving the defendant, Hines, Mabry and the victim. It appeared to her that there was going to be a fight. Holloway knew the defendant and approached him to stop him from fighting. At that point, a gun fired. The defendant was moving his hands as he spoke to Hines, and Holloway did not see anything in them.

Holloway was twenty years old and had known the defendant since they were in elementary school. Their families were close. At some point, Holloway became aware that the defendant had been arrested for the shooting. She did not contact the police to tell them that the defendant had not committed the shooting, even though she cared for the defendant. Holloway did not see the defendant with a gun, but she could not testify definitively that the defendant did not shoot the victim.

Burke testified that she went to the club with Holloway and Thomas. She was with Holloway when she noticed an altercation between some men toward the back of the club. Holloway walked toward the men and Burke followed her. Burke recognized the defendant, whom she had never spoken to, but knew by sight. The

defendant was gesturing with his hands and Burke did not see anything in them. Burke heard a gunshot but did not know where it came from or see a flash of light.

Arkady Katsnelson, an associate medical examiner with the office of the chief medical examiner, testified that he performed an autopsy on the victim on May 22, 2000. Katsnelson recovered several bullet fragments from the victim's brain. He found no gun powder residue or soot around the wound, indicating that the gun had been discharged twenty-two inches or more from the victim's head. The track of the bullet from the front of the victim's head to the back was horizontal, indicating that, if the victim had been standing erect when he was shot, the barrel of the gun would have been level to the ground at the height of the wound. Katsnelson could not determine the position of the victim at the time that he was shot without knowing the position of the gun, and vice versa.

The state filed an amended two part information against the defendant. In part A, the defendant was charged with murder in violation of § 53a-54a, carrying a pistol without a permit in violation of § 29-35 and criminal possession of a firearm by one previously convicted of a felony in violation of § 53a-217. In part B of the information, the defendant was charged with commission of a class A, B or C felony with a firearm in violation of General Statutes § 53-202k.[5] At trial, the state sought to prove the murder charge under a theory of transferred intent. Specifically, the state sought to prove that the defendant had intended to kill Sanders and, acting with that intent, killed the victim. At the close of the state's case, the defendant made a motion for judgment of acquittal on the ground that there was

___

[5] General Statutes § 53-202k provides in relevant part: "Any person who commits any class A, B or C felony and in the commission of such felony uses . . . any firearm . . . shall be imprisoned for a term of five years . . . ."

insufficient evidence for the jury reasonably to conclude beyond a reasonable doubt that the defendant had been in possession of a firearm. The trial court denied the motion. At the close of evidence, the defendant again moved for judgment of acquittal on the same ground and the court again denied the motion. The jury found the defendant guilty as charged.

Thereafter, a member of the jury, identified as M.C., wrote a letter to the trial court.[6] M.C. wrote that he had

[6] The letter stated in relevant part: "Your Honor . . . . Shortly after my decision to find [the defendant] guilty of . . . murder, I found my doubts about the crime reappearing, but complicated by an observation that occurred to me too late for presentation to the jury. . . . Unfortunately, as that juror who expressed doubts regarding [the defendant's] 'intent' to do murder throughout the deliberation, I feel an obligation not only to [the defendant], but more particularly, my conscience, to broach the issue with the one person to whom is left the final disposition of [the defendant's] case.

"I did then [on the date of the verdict], and do now, believe that [the defendant] caused this death, and that he pulled the trigger, shooting the wrong man. I came to see that events at the [club] very likely unfolded as other jurors were convinced they had.

"My original doubts rested in the possibility that in any scuffle, especially where others are trying to hold back the participants, someone was likely to have had his hand on [the defendant's] arm or even the gun. In fact, a stranger to the case—an unnamed man or woman in the crowd—could have reached for his gun hand. The gun goes off and [the victim] lay dead. This possible element of 'accident,' if you can call it that, seemed to me to pre-empt [the defendant's] opportunity to declare his intent. (He may have wanted only to threaten . . . Sanders with the pistol as a way to bring the argument to an end. After all, there seems so little motive for this killing.)

"Other jurors were of the opinion that such an occurrence would not compromise the 'intent.' [The defendant] was in the act of firing, they contended, even if his arm was struck; the slide had to have been pulled back on the automatic pistol. No clear testimony indicated the scuffle took such a rough form or that anyone hit [the defendant's] gun hand. (I maintain that a garbled passage from . . . Sanders' testimony documented that 'someone' or 'something' was 'on' [the defendant's] arm, but no one else recalled this.)

"Eventually I abandoned my position, but it took no more time than a walk to the court's parking garage for me to trip over another qualifying observation.

"Can I make myself more ridiculous to you (more than this letter already has) when I suggest the bullet that killed [the victim] may have ricocheted from the floor? I realize that investigators may have eliminated this theory, but no such references were made in court. Such an occurrence would

believed at the time of the verdict, and continued to believe, that the defendant had caused the victim's death. At the outset of deliberations, M.C. had doubts as to whether the defendant had intended to kill Sanders or, instead, had intended only to threaten him and fired the gun accidentally when his arm was struck during the scuffle. Ultimately, however, he abandoned the position that the act of shooting had been accidental. Then, shortly after the verdict was returned, M.C. developed another theory of what might have happened on the night of the shooting, namely, that the bullet might have ricocheted off the floor before hitting the victim. M.C.

explain a great deal of testimony, and, unfortunately for my conscience, a bullet that 'possibly' came off the floor would have woven together a number of small disparate doubts into a more credible fabric.

\* \* \*

"Of course, I realize all of this is speculation (and would be happy to hear that speculation is not the same as doubt). Also, if events at the [club] transpired as above, is it possible that [Mabry] . . . Sanders and even [the defendant] don't know it? And if they do, why wouldn't they relate the story in this manner?

"Here's one reason. Is it possible [the victim] passed the gun to [the defendant] in the heat of this argument when he and [Mabry] 'closed-in,' as . . . Sanders reported it, and not before, as [Mabry] implied in his testimony. You might even speculate that the gun was handed to [the defendant] with the slide back, and this was unknown to [the defendant], who in the process of simply clutching it may have fired it. Could [Mabry] have stopped short of such testimony out of fear that the state would link him to the killing as an accessory?

"I'm not a detective . . . and bringing forward these observations at so untimely a date is very probably unfair to you and the court (and none of my business now). Yet, a week after the trial, these suspicions remain consistent with the facts and the testimony—which, I believe, is what other jurors wanted to hear from me.

"But, of course, even if the above should prove true, the state and other jurors might still perceive of [the defendant's] actions as murder . . . . (On the whole, I believe [the] jury needed more help on the issue of 'intent,' and how to delineate degrees of guilt in the charges before us.)

"I console myself that something much less complicated likely happened at the [club] in May 2000, something angry and more direct, just as the jurors, including myself, saw it. Still, I would sleep better knowing that the bullet that struck [the victim] did not first hit the floor. And if it did, that the fact might be cause enough for the state to re-think [its] position."

suggested in his letter that this fact would explain much of the evidence. He also wrote that, even if the bullet had ricocheted, "the state and other jurors might still perceive of [the defendant's] actions as murder . . . . (On the whole, I believe [the] jury needed more help on the issue of 'intent,' and how to delineate degrees of guilt in the charges before us.)"

The trial court notified counsel that it had received the letter and provided them with copies of it. The defendant then filed a motion for a mistrial on the ground that the verdict had not been unanimous. During a hearing on the motion, the defendant argued that the letter suggested that M.C. had not been firmly convinced of the defendant's guilt and had been coerced or improperly influenced by the other jurors. When the court inquired whether the defendant wanted to recall the jurors and conduct an inquiry, defense counsel responded that "if it would help the court to find out precisely . . . what was going on in [M.C.'s] head, I would then ask the court . . . to bring [M.C.] back [to] explain himself." The court did not recall M.C. or any of the other jurors or conduct an evidentiary hearing.

The trial court denied the motion for a mistrial. It noted that the letter clearly indicated that M.C. had agreed with his fellow jurors at the time of the verdict that the defendant was guilty and that his doubts had developed only later. Moreover, the court had asked the jury at the time of the verdict if they all agreed with it and all of the jurors, including M.C., had either said yes or nodded affirmatively.[7] The court rejected the defendant's arguments that the letter showed that "the forensic evidence does not match up with the testimony of the state's witnesses" and that M.C. had been improperly coerced or intimidated into voting to find the defen-

---

[7] The defendant did not request that the trial court poll the jurors individually and the court did not do so.

dant guilty. The court stated that "nothing in the forensic evidence . . . [makes] the verdict a scientific impossibility." The court also noted that M.C. did not claim in the letter that there had been misconduct by any of the jurors, the judge, the state or anyone else.

Thereafter, the trial court rendered judgment in accordance with the guilty verdicts. This appeal followed. The defendant claims on appeal that: (1) there was insufficient evidence for the jury reasonably to conclude beyond a reasonable doubt that he had intended to kill Sanders;[8] (2) the trial court improperly denied his motion for a mistrial on the ground that M.C.'s letter established that the jury verdict had not been unanimous; and (3) the trial court improperly rejected the defendant's request for an evidentiary hearing to investigate possible juror misconduct. We reject all three claims.

I

We first address the defendant's claim that the state failed to present sufficient evidence for the jury reasonably to conclude beyond a reasonable doubt that the defendant intended to kill anyone. Although the state claims that this issue is not preserved for review because the defendant failed to make this claim to the trial court, it concedes, and we agree, that the claim is reviewable under the first two prongs of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[9] See

[8] The defendant has abandoned his claim to the trial court that there was insufficient evidence to establish that he was in possession of a gun.

[9] Under *Golding*, a defendant can prevail on appeal from an unpreserved claim "only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the

*State* v. *Roy*, 233 Conn. 211, 212–13, 658 A.2d 566 (1995) (due process prohibits conviction of any person except upon proof sufficient to convince trier of fact beyond reasonable doubt of existence of every element of offense). We conclude, however, that there was sufficient evidence of the defendant's intent to kill Sanders and, therefore, the defendant cannot prevail under the third prong of *Golding*.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multi-

defendant may prevail." *State* v. *George B.*, 258 Conn. 779, 784, 785 A.2d 573 (2001).

tude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 377–79, 796 A.2d 1191 (2002).

The intentional murder statute, § 53a-54a (a), provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person *or of a third person* . . . ." (Emphasis added.) "Thus, the statute specifically provide[s] for intent to be transferred from the target of the defendant's conduct to an unintended victim." (Internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 49, 826 A.2d 1126 (2003). We have held that "[t]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994). Accordingly, in order to establish the elements

of murder under a theory of transferred intent, the state must prove beyond a reasonable doubt that the defendant had the conscious objective to cause the death of another person and, acting with that intent, caused the death of a third person.

Because "direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *DeCaro*, 252 Conn. 229, 239–40, 745 A.2d 800 (2000). "Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 678–79, 613 A.2d 788 (1992). In addition, intent to kill may be inferred from evidence that the defendant had a motive to kill. Id., 680.

In the present case, the state presented evidence that the defendant had been involved in an altercation with Sanders immediately before the shooting, that Sanders had punched the defendant in the head and that the defendant, in response, had turned to face Sanders, drawn a loaded pistol, raised it to shoulder height and fired it. The bullet struck and killed the victim. On the basis of this evidence, the jury reasonably could have found that the defendant had a motive to kill Sanders and used a deadly weapon in a manner likely to cause his death. On the basis of the evidence of the defendant's motive, the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to the death, we conclude that the jury reason-

ably could have inferred that the defendant had the intent to kill.

The defendant argues, however, that there was insufficient evidence of his intent to kill because: (1) the altercation between the defendant and Sanders did not provide a sufficient motive for murder; (2) this court has held that specific intent to kill cannot be inferred from the mere fact that the defendant used a deadly weapon; (3) the fact that the defendant did not aim the gun at Sanders gives rise to a reasonable doubt that the defendant intended to kill him; and (4) the fact that the defendant did not continue shooting at Sanders gives rise to a reasonable doubt that the defendant intended to kill him. We address each of these claims in turn.

The defendant first claims that, although the jury reasonably could have concluded that the defendant had intended to threaten or frighten Sanders with the gun in order to prevent him from attacking him further, it could not reasonably have inferred that the defendant would intentionally kill Sanders in response to a punch. We are not persuaded. The defendant has not cited, nor are we aware of, any authority for the proposition that a motive to kill cannot be established by evidence that the defendant was responding to a provocation that did not warrant a deadly response. The jury is not required to close its eyes to the unfortunate reality that murders frequently are committed in response to seemingly minor provocations.[10] See, e.g., State v. Higgins, supra, 265 Conn. 39–40 (intended victim of drive-by shooting previously had requested shooter to drive more slowly

---

[10] Indeed, if a provocation does warrant a deadly response, the defendant cannot be convicted of murder. See State v. Prioleau, 235 Conn. 274, 285–86, 664 A.2d 743 (1995) (person may justifiably use deadly physical force in self-defense if he reasonably believes attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and deadly physical force is necessary to repel such attack).

and unintentionally had broken window of shooter's car). Accordingly, we conclude that the jury reasonably could have found that the evidence that Sanders and the defendant had been involved in an altercation and that Sanders had punched the defendant supported an inference that the defendant had a motive to kill Sanders.

The defendant next claims that specific intent to kill cannot be inferred from the fact that the defendant fired a gun because a gun may be fired intentionally, recklessly or accidentally. In support of this claim, he cites our statement in *State* v. *Ray*, 228 Conn. 147, 157 n.8, 635 A.2d 777 (1993), that the fact that the defendant used a deadly weapon "tells us nothing about the defendant's state of mind." We are not persuaded. In *Ray*, the defendant was charged with manslaughter after he had stabbed the victim to death. Id., 151–52. The defendant claimed that he had acted in self-defense and requested that the court charge the jury on criminally negligent homicide as a lesser included offense of manslaughter. Id. The court refused to do so and the defendant was convicted of the lesser included offenses of manslaughter in the second degree and assault in the second degree. Id., 152. The defendant appealed to the Appellate Court, which affirmed his conviction. *State* v. *Ray*, 30 Conn. App. 95, 97, 619 A.2d 469, rev'd, 228 Conn. 147, 635 A.2d 777 (1993).

On appeal to this court, we reversed the judgment of the Appellate Court. *State* v. *Ray*, supra, 228 Conn. 150. We concluded that the jury reasonably could have found that the defendant had not perceived the risk that he might cause the victim's death and, therefore, that the jury could have found him guilty of the lesser included offense of criminally negligent homicide. Id., 156. In support of that conclusion, we cited *State* v. *Edwards*, 214 Conn. 57, 69, 570 A.2d 193 (1990), in which we held that the jury reasonably could have inferred that

the defendant's preoccupation with suicide prevented him from perceiving the risk created by his possession of a loaded gun and struggle to retain it. We rejected the state's claim that *Edwards* was distinguishable because the defendant's use of a knife in self-defense in *Ray necessarily* involved a risk of death. We noted, in the statement relied on by the defendant in the present case, that the defendant in *Edwards* also had possessed "a deadly weapon, but this fact tells us nothing about the defendant's state of mind." *State* v. *Ray,* supra, 228 Conn. 157 n.8.

We conclude that the defendant interprets the statement in *Ray* too broadly. The statement was in response to a claim by the state that evidence that the defendant had used a deadly weapon *conclusively proved* intent to kill, and, therefore, the defendant was not entitled to an instruction on a lesser included offense of criminally negligent homicide. Although we could have expressed ourselves more narrowly, it is apparent that what we meant to convey was that the fact that a defendant has used a deadly weapon is not, as a matter of law, *conclusive* proof of any particular state of mind. We did not intend to suggest that evidence that the defendant used a deadly weapon cannot constitute circumstantial evidence of a defendant's state of mind. Any such suggestion would be entirely inconsistent with our well established principles governing sufficiency claims relating to mental states.

Although we agree with the defendant that a gun may be fired accidentally or recklessly, "[i]n evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Meehan,* supra, 260 Conn. 378. We conclude,

in light of the evidence establishing the defendant's motive and the circumstances surrounding the shooting, that it was reasonable and logical for the jury to conclude that the defendant intentionally fired the gun and had a specific intent to kill.

We next address the defendant's claim that the fact that the defendant was not aiming the gun at Sanders at the time he fired it raises a reasonable doubt that the defendant intended to kill as a matter of law. In support of this claim, he cites *State* v. *Blackman*, 246 Conn. 547, 559–60, 716 A.2d 101 (1998). In that case, the victim died of a gunshot wound to the head. We held that the fact that the defendant had aimed the gun at the victim's head supported an inference of an intent to kill. Id. The defendant in the present case points out that the bullet did not strike Sanders. He argues that this fact established that he did not aim at Sanders and, therefore, under *Blackman*, the jury was not permitted to infer an intent to kill. We disagree.

Our conclusion in *Blackman* that the jury could infer that the defendant intended to kill the victim from the fact that he aimed at him and struck him, does not suggest that the fact that a bullet did *not* strike an intended victim constitutes conclusive evidence that the defendant did *not* aim at the intended victim and, therefore, had *no* intent to kill. It is a matter of common sense that it is possible to aim a gun at an intended target and miss it. In the present case, there was evidence that the scene of the shooting was crowded and chaotic, with loud music and flashing strobe lights, and that the participants in the scuffle were moving and grabbing at each other. Again, in light of the evidence of the defendant's motive and the other circumstances leading to the shooting, the jury reasonably could have inferred

that the defendant had aimed at Sanders and missed him.[11]

Finally, we address the defendant's claim that the fact that he did not continue shooting until he killed Sanders necessarily establishes a reasonable doubt that he had an intent to kill. We disagree. The jury reasonably could have concluded that, having just shot his friend in the head, the defendant was reluctant to fire additional gunshots at Sanders as he dove into the dispersing crowd.

We conclude that, on the basis of the evidence presented, the jury reasonably could have found beyond a reasonable doubt that the defendant had the intent to kill Sanders and, acting with that intent, killed the victim. Accordingly, we reject this claim.

## II

We next address the defendant's claims relating to the letter from M.C. He first claims that the trial court improperly denied his motion for a mistrial. In support of this claim, he argues that the letter establishes that the verdict was not unanimous because it shows that M.C. had not reached an independent judgment that the defendant was guilty. He also claims that the trial court should have held an evidentiary hearing to investigate possible juror misconduct. In support of this claim he argues that the letter established that the jurors did not understand the law and that M.C. engaged in improper conduct. We reject both claims.

---

[11] The defendant argues that the absence of gunpowder residue around the victim's wound proves that the victim was not close to the defendant and, therefore, could not have been between the defendant and Sanders at the time that he was shot, as Sanders testified, but had to be standing to the side, as Mabry testified. He further argues that this establishes that the defendant did not aim the gun at Sanders. We disagree. As we have indicated, the fact that the gun was not pointed directly at Sanders at the time that it was fired does not establish conclusively that the defendant was not aiming at him.

## A

We first address the defendant's claim that the trial court improperly denied his motion for a mistrial. "The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Taft*, 258 Conn. 412, 418, 781 A.2d 302 (2001).

"It is settled doctrine in Connecticut that a valid jury verdict in a criminal case must be unanimous." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 416, 857 A.2d 808 (2004); see also *Burch* v. *Louisiana*, 441 U.S. 130, 138, 99 S. Ct. 1623, 60 L. Ed. 2d 96 (1979) (right to unanimous verdict rendered by six person jury protected under right to jury trial guaranteed by due process clause of fourteenth amendment to United States constitution); *State* v. *Jennings*, 216 Conn. 647, 656, 583 A.2d 915 (1990) (right to unanimous verdict protected by article first, § 8, of constitution of Connecticut). "Requiring unanimity induces a jury to deliberate thoroughly and helps to assure the reliability

of the ultimate verdict." (Internal quotation marks omitted.) *State* v. *Sawyer*, 227 Conn. 566, 585, 630 A.2d 1064 (1993). "[E]ach juror's vote must be his [or her] own conclusion and not a mere acquiescence in the conclusions of his [or her] fellows . . . ." (Internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 440, 778 A.2d 812 (2001).

In support of his claim that the trial court improperly denied his motion for a mistrial, the defendant argues that the letter shows that the evidence presented by the state could not support a finding that the defendant had the intent to kill. He further argues that this establishes that the jury did not deliberate thoroughly. Accordingly, he argues, the very purpose of the unanimity requirement, namely to ensure the reliability of the ultimate verdict, was compromised.

The defendant's logic is flawed. As the trial court indicated, and as we have concluded, "nothing in the forensic evidence . . . [made] the verdict a scientific impossibility." Even if the defendant's guilt *were* a scientific impossibility, however, that would not establish that the verdict was not unanimous, it would establish only that it was not supported by the evidence. M.C.'s letter clearly indicated that, although he had doubts about the defendant's motive and intent during deliberations, he ultimately was persuaded that "events at the [club] very likely unfolded as other jurors were convinced they had" and voluntarily abandoned his doubts before voting to find the defendant guilty. The letter does not suggest, and the defendant makes no claim on appeal, that M.C.'s vote was improperly coerced either by the trial court or by the other jurors. Moreover, it should be obvious that the fact that a juror developed a new theory about what transpired on the night of the shooting *after* the verdict was rendered could not affect the unanimity of the verdict. Accordingly, we reject the defendant's claim that the verdict was not unanimous

and conclude that the trial court properly denied his motion for a mistrial.

## B

We next address the defendant's claim that the trial court should have held an evidentiary hearing to determine (1) whether the jurors had engaged in misconduct by misapplying the court's instructions on the element of specific intent and (2) whether M.C. had engaged in juror misconduct by acquiescing in the conclusions of his fellow jurors and failing to apply his independent judgment. We disagree.

It is well established that "evidence as to the expressions and arguments of the jurors in their deliberations and evidence as to their own motives, beliefs, mistakes and mental operations generally, in arriving at their verdict" is excludable in postverdict proceedings as immaterial. (Internal quotation marks omitted.) *Aillon* v. *State*, 168 Conn. 541, 550, 363 A.2d 49 (1975). "[An] affidavit to avoid the verdict may not be received to show any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror's breast." (Internal quotation marks omitted.) *Josephson* v. *Meyers*, 180 Conn. 302, 310–11, 429 A.2d 877 (1980). "That rule has been aptly described as applying the parol evidence rule to a jury's verdict, so that their outward verdict as finally and formally made, and not their prior and private intentions, is taken as exclusively constituting the act." *Aillon* v. *State*, supra, 550. "A jury verdict may not be impeached by an affidavit of a juror showing that he misunderstood the instructions of the court. . . . It follows, therefore,

that the verdict also may not be impeached by an unsworn and uncorroborated statement offered by a party to the action [indicating that a juror had made statements after the verdict suggesting that the jury had misapplied the law]." (Citations omitted; internal quotation marks omitted.) *Enquire Printing & Publishing Co.* v. *O'Reilly*, 193 Conn. 370, 378, 477 A.2d 648 (1984). "That the verdict may have been the result of compromise, or a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." (Internal quotation marks omitted.) *State* v. *DeCaro*, supra, 252 Conn. 243.

"On the other hand, the rule [excluding evidence of jurors' mental operations as immaterial] does not prohibit juror testimony regarding the failure to obey certain essential formalities of juror conduct, i.e., irregularities and misconduct extraneous to the mental operations of the jury. . . . Thus, any conduct in violation of [General Statutes] § 51-245 [prohibiting jurors from conversing with any person who is not a member of the jury relative to the cause under consideration before they have returned their verdict] . . . may be established by the testimony of a juror. As early as 1866 it was recognized [t]hat affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or other artifice or improper manner." (Citations omitted; internal quotation marks omitted.) *Aillon* v. *State*, supra, 168 Conn. 550–51.

In *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995), we exercised our supervisory power to require

that, whenever there is a claim of juror misconduct, the trial court is required to conduct an inquiry to determine the nature and extent of the jury taint, if any. "Although the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jury misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between." Id. "[F]rivolous or incredible allegations may be disposed of summarily." Id., 531.

In support of his claim that the trial court improperly denied his request for an evidentiary hearing, the defendant takes great pains to characterize the thoughts and discussions described in M.C.'s letter as juror misconduct, which is subject to judicial inquiry, rather than as the mental operations of M.C. and the other jurors, into which the courts may not delve. It is clear, however, that the claim that the jury as a whole misapplied the law of specific intent and the claim that M.C. improperly acquiesced in the opinions of his fellow jurors during deliberations cannot properly be characterized as claims of jury misconduct. These are precisely the types of matters that inhere in the verdict itself and into which the court is not permitted to inquire. See *Josephson* v. *Meyers*, supra, 180 Conn. 310–11 (court may not consider evidence that juror misunderstood instructions of court or that juror was unduly influenced by statements of fellow jurors). Accordingly, we conclude that the trial court properly denied the defendant's request for an evidentiary hearing.

The judgment is affirmed.

In this opinion the other justices concurred.