### STATE OF CONNECTICUT *v.* VERNAL MORGAN
### (SC 17368)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

Argued April 12—officially released August 2, 2005

*Jennifer C. Vickery*, with whom, on the brief, was *Damon A. R. Kirschbaum*, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom, on the brief, was *Scott Murphy*, state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The dispositive issue in this appeal[1] is whether there was sufficient evidence of the defendant's identity to support a jury verdict finding him

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

guilty of robbery in the first degree in violation of General Statutes § 53a-134,[2] and conspiracy to commit robbery in the first degree in violation of General Statutes § 53a-48.[3] Following a trial, the jury found the defendant guilty on both counts, and the trial court rendered judgment of conviction in accordance with the verdict. The defendant claims that the evidence was insufficient to establish, beyond a reasonable doubt, his identity as the gunman in the robbery in question. We conclude that the evidence was sufficient to support the defendant's conviction. Accordingly, we affirm the judgment of the trial court.

In connection with two separate incidents that occurred within seven weeks of each other, the defendant, Vernal Morgan, was charged in two cases with two counts of robbery in the first degree in violation of § 53a-134 (a) (4), and two counts of conspiracy to commit robbery in the first degree in violation of § 53a-48. The trial court consolidated the two cases. Counts one and two of the information related to an armed robbery that had taken place on May 29, 2001, at a Subway sandwich shop located at 589 Hartford Road in New Britain. Counts three and four of the information related to an armed robbery that had taken place on April 11, 2001, at a Blimpie's Sub Shop (Blimpie's)

[2] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ."

[3] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

located at 1537 Stanley Street in New Britain. At the
conclusion of the state's case, the defendant moved for
judgment of acquittal with respect to counts three and
four of the information based on the theory that there
was not sufficient evidence introduced at trial to sup-
port a guilty verdict. The trial court denied this motion
and allowed the case to proceed against the defendant
with respect to all four counts of the information. The
jury found the defendant guilty on all four counts, and
the trial court subsequently rendered judgment of con-
viction against the defendant consistent with the jury's
verdict.[4] This appeal followed.

The defendant challenges his conviction on counts
three and four of the information, in connection with
the Blimpie's robbery, on the basis that there was insuf-
ficient evidence for the jury to conclude, beyond a rea-
sonable doubt, that he was the gunman in the robbery
in question.[5] The jury reasonably could have found the

[4] On the basis of the defendant's conviction of counts one through four
of the information and on the court's further factual findings, the defendant
was also convicted of being a persistent felony offender. The defendant
does not challenge that conviction on appeal.

[5] On appeal, the defendant also challenges, for the first time, based on
federal and state constitutional grounds, a "show up" procedure used to
identify him as the armed assailant in the Subway robbery. Specifically, the
defendant claims that the identification procedure was a violation of his
due process rights under the fifth and fourteenth amendments to the consti-
tution of the United States because it was unnecessarily suggestive and not
reliable, and that it was a violation of the due process requirements of
article first, §§ 8 and 9, of the constitution of Connecticut. The defendant
acknowledged at oral argument before this court that he did not raise this
issue prior to this appeal. The defendant seeks to prevail on these newly
raised claims under the principles of State v. Golding, 213 Conn. 233, 239–40,
567 A.2d 823 (1989), in which we held that "a defendant can prevail on a
claim of constitutional error not preserved at trial only if all of the following
conditions are met: (1) the record is adequate to review the alleged claim
of error; (2) the claim is of constitutional magnitude alleging the violation
of a fundamental right; (3) the alleged constitutional violation clearly exists
and clearly deprived the defendant of a fair trial; and (4) if subject to
harmless error analysis, the state has failed to demonstrate harmlessness
of the alleged constitutional violation beyond a reasonable doubt." At trial,
the defendant never made an objection, a request for a hearing, a motion

following facts regarding the Blimpie's robbery. On April 11, 2001, Holly Broderick was working at Blimpie's located at 1537 Stanley Street in New Britain. At approximately 11 p.m., two men entered the store and demanded that Broderick give them the money in the cash register. One of the men was wearing a blue sweatshirt, black gloves, and large chunky black boots, and was carrying a handgun. Broderick was behind the counter at eye level with the door when she first saw the individuals. Broderick observed both men enter the store and was able to get a good look at their faces as they ran through the front door.[6] In addition to noticing what the individuals were wearing and the fact that both men were black, she was able to observe some distinctive facial features of the individual carrying the handgun. In particular, as the individuals entered Blimpie's, Broderick noticed the shape of the gunman's mouth, the coloration of his lips, and the fact that he had very deep set eyes. Very shortly after the assailants

to suppress or any other motion in opposition to the admissibility of the identification evidence in the Subway robbery. Consequently, the trial court did not make any initial factual findings or legal conclusions concerning the suggestiveness and reliability of the identification procedure as applied to this specific case. These findings and legal conclusions are essential to the adjudication of such a claim. See *State* v. *Gordon*, 185 Conn. 402, 414–15, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d. 848 (1982). Accordingly, we decline to review the defendant's unpreserved federal and state constitutional claims because there is not an adequate record to review the alleged claims of constitutional error, and, therefore, the defendant's argument fails under the first prong of the *Golding* analysis.

[6] The following is the relevant portion of the colloquy on direct examination between the state's attorney and Broderick:

"Q. When you first saw those two individuals, can you tell the jury what you saw them doing?

"A. As I said, they were opening the door and running—well, they were running through as they were pulling masks down over their faces.

"Q. And did you have an opportunity to observe the face of either of those two individuals?

"A. Yes.

"Q. Okay. And would you tell the jury whether or not you were able to get a good look at those individuals?

"A. Yes, I was able to get a good look at them."

entered Blimpie's, both individuals pulled down masks covering their faces.

Upon first seeing the individuals enter Blimpie's, Broderick recalled advice that she had received from her father about what to do in a situation where she may need to make a personal identification. Specifically, Broderick's father relayed advice from his father, a former police officer, who had always advised having a plan for such situations and focusing on physical characteristics that are not easily changed such as skin color, the size and shape of a person's nose, lip size, or the size and shape of an individual's ears and chin. These were the primary thoughts going through Broderick's mind as she observed the two individuals open the door to Blimpie's and run into the store.

Immediately after the individuals pulled down their masks, Broderick ran to the back room of the store to call the police by dialing 911. Upon being connected with a 911 operator, Broderick intended to place the receiver next to the television and videocassette recorder connected to the Blimpie's security surveillance system so that the operator could hear what was transpiring in the store and could dispatch officers to the scene. Before Broderick was able to complete this call, however, the gunman followed her into the back room and forced her to return to the main room where the cash register was located. The security videotape, along with still photographs converted from the videotape, were presented to the jury and were consistent with Broderick's initial description regarding the sequence of events that transpired once the individuals entered Blimpie's. In particular, once the armed assailant forced Broderick to return to the front of the store, he repeatedly threatened Broderick with his weapon and demanded that she open the store's cash register. Broderick opened the cash register, and the individual pointing his weapon at her, cleared out the till, and

handed the money to the other assailant. At the time of the robbery, the cash register held in excess of $400 in cash. The gunman also repeatedly demanded that Broderick open the store's safe. Broderick told both individuals that only managers had access to the safe and that she could not open it, at which point the two men ran out of the store.

Shortly after the two assailants left Blimpie's with the money from the cash register, Broderick again called 911. Moments later, Officer Bryant Pearson of the New Britain police department arrived at the scene and took Broderick's written statement, in which she gave a description of the robbery and the two assailants. Subsequently, on two separate occasions, one shortly after the robbery and another on May 30, 2001, Broderick reported to the police station to review photographs in an attempt to identify the individuals who committed the robbery.

At the first meeting at the police station, Broderick reviewed hundreds of photographs of potential suspects, but did not identify any of them as the gunman. At her meeting on May 30, 2001, Broderick met with Detective Thomas Steck, who had prepared a standard photographic array of eight potential suspects of similar description for her review. Broderick identified the defendant as the individual who had threatened her at gunpoint and had demanded that she provide him with all of the money in the safe and cash register. The format of the photographic array was consistent with the police department's photographic identification procedures routinely used during the course of criminal investigations. Prior to these meetings, Broderick was not told that the police had a suspect in custody and she was not influenced in any way to identify a particular individual in the photographic array. To the contrary, Broderick was simply told that the officers had some additional photographs that they wanted her to view.

Upon viewing the photographic array on May 30, 2001, Broderick immediately identified the defendant as the individual who had threatened her at gunpoint during the Blimpie's robbery. Broderick told Steck and later testified at trial that she was completely confident in her identification, citing, among other things, the distinctiveness of the coloration of the defendant's lips and the shape of his eyes.[7] After identifying the defendant as the assailant on the basis of the photographic array, Broderick provided Steck with a statement to that effect. She also reviewed a photocopy of the photographic array and circled the defendant's photograph to signify her identification of him as the individual who had robbed her store at gunpoint.

The defendant claims that there was insufficient evidence to support his convictions in connection with the Blimpie's robbery. Specifically, the defendant argues that: (1) Broderick's identification of the defendant as the gunman in the robbery on the basis of the color and shape of his lips was "logically impossible" given the fact that the assailant's lips had been covered

---

[7] The following is the relevant portion of the colloquy between the state's attorney and Broderick:

"Q. Would you tell the jury what you noticed in terms of coloration of the lips?

"A. The most distinctive thing that I noticed was that they were sort of pink on his bottom lip versus some—versus just all brown, there was pink.

"Q. And the photograph that you picked up, which has been termed number two, did that picture merely resemble the person who committed the robbery or was that a picture of the person who did in fact commit the robbery?

"A. That's him.

"Q. Any question in your mind?

"A. No.

"Q. And the defendant as he sits over there next to [defense counsel], does he simply resemble the person who was the gunman or was he in fact the gunman?

"A. That's him.

"Q. No question?

"A. No question."

by a mask during the robbery; and (2) neither the surveillance videotape nor the remaining statements made by Broderick contained any factual evidence that the defendant was the gunman.

To convict a defendant of the crime of robbery in the first degree, the state must prove beyond a reasonable doubt that "in the course of the commission of the crime of robbery as defined in [General Statutes §] 53a-133[8] or of immediate flight therefrom, [the defendant] or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . ." General Statutes § 53a-134 (a). The state has the burden of proving beyond a reasonable doubt the defendant's identity as one of the robbers, and the issue of the identity of the defendant as a perpetrator of the robbery is one of fact for the jury. See *State* v. *Harris*, 227 Conn. 751, 758, 631 A.2d 309 (1993); *State* v. *Abraham*, 64 Conn. App. 384, 402, 780 A.2d 223, cert. denied, 258 Conn. 917, 782 A.2d 1246 (2001).

The defendant does not challenge the sufficiency of the evidence related to the individual elements of the crimes charged. Indeed, the footage and still photographs from the Blimpie's security surveillance videotape that were submitted to the jury leave little question that an armed robbery did, in fact, take place at Blim-

---

[8] General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

pie's on April 11, 2001, in violation of § 53a-134 (a) (4). Furthermore, the surveillance videotape shows two assailants entering Blimpie's together, acting in concert, and engaging in overt acts in furtherance of the robbery in violation of § 53a-48. Rather, the defendant contends only that the evidence of his identity as a participant in the robbery was insufficient to support the jury's inference linking him to the crimes and, therefore, that the evidence was insufficient to support his conviction on counts three and four of the information. We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 405, 869 A.2d 1236 (2005); *State* v. *Meehan*, 260 Conn. 372, 377–79, 796 A.2d 1191 (2002).

We also note "that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt."

(Internal quotation marks omitted.) *State* v. Gary, supra, 273 Conn. 405.

Additionally, "[a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) Id., 406; *State* v. *Meehan*, supra, 260 Conn. 378–79.

Moreover, "[w]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Mejia*, 233 Conn. 215, 224, 658 A.2d 571 (1995). Additionally, because the jury has the opportunity to observe the conduct, demeanor and attitude of the witnesses and to gauge their credibility, "[i]t is axiomatic that evidentiary inconsistencies are for the jury to resolve, and it is within the province of the jury to believe all or only part of a witness' testimony." *State* v. *Meehan*, supra, 260 Conn. 381. We are also mindful that, once a defendant has been found guilty of the crime charged, a reviewing court conducts its review of all the evidence in the light most favorable to the prosecution. In short, "[t]he evidence must be given a construction most

favorable to sustaining the jury's verdict." *State* v. *Carter*, 196 Conn. 36, 44, 490 A.2d 1000 (1985). "Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable." (Internal quotation marks omitted.) *State* v. *Ford*, 230 Conn. 686, 692, 646 A.2d 147 (1994). "[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Scielzo*, 190 Conn. 191, 197, 460 A.2d 951 (1983). We also note that "[i]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 132–33, 646 A.2d 169 (1994).

Additionally, when determining whether a witness had sufficient time to observe a defendant to ensure a reliable identification, we have stated that "a good hard look will pass muster even if it occurs during a fleeting glance." *State* v. *Ledbetter*, 185 Conn. 607, 615, 441 A.2d 595 (1981), citing *Coleman* v. *Alabama,* 399 U.S. 1, 4–6, 90 S. Ct. 1999, 26 L. Ed. 2d 387 (1970); *State* v. *Thompson*, 81 Conn. App. 264, 273, 839 A.2d 622, cert. denied, 268 Conn. 915, 847 A.2d 312 (2004). In particular, we have recognized that a view of even a few seconds may be sufficient for a witness to make an identification;

see *State* v. *Piskorski*, 177 Conn. 677, 743, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979) (superseded by statute on other grounds); *Williams* v. *Bronson*, 21 Conn. App. 260, 265, 573 A.2d 330 (1990); and that it is for the trier of fact to determine the weight to be given that identification. See *State* v. *Mitchell*, 204 Conn. 187, 202–203, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). Furthermore, it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. See *State* v. *Pinnock*, 220 Conn. 765, 778–79, 601 A.2d 521 (1992). It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness; see *Zarembski* v. *Three Lakes Park, Inc.*, 177 Conn. 603, 608, 419 A.2d 339 (1979); and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial. See *Angelica* v. *Fernandes*, 174 Conn. 534, 535, 391 A.2d 167 (1978); *Nolan* v. *Nationwide Mutual Ins. Co.*, 60 Conn. App. 68, 73, 758 A.2d 432, cert. denied, 255 Conn. 920, 763 A.2d 1042 (2000). Finally, we note that Connecticut case law has previously recognized in-court identifications and identifications from fairly presented photographic arrays as sufficient evidence by themselves to allow the trier of fact to conclude that it was the defendant who committed the crimes charged. See *State* v. *Smith*, 57 Conn. App. 290, 298–99, 748 A.2d 883, cert. denied, 253 Conn. 916, 754 A.2d 164 (2000) (concluding that even if court had discounted all other evidence of defendant's identity, evidence was sufficient for conviction based solely on witnesses' testimony identifying defendant); *State* v. *Rivera*, 74 Conn. App. 129, 138, 810 A.2d 824 (2002) (noting that victim had identified defendant from array of photographs and at trial, court concluded that victim's testimony alone was sufficient for jury to find that defendant had shot victim).

In the present case, we conclude that ample evidence exists for a reasonable jury to have concluded that the defendant was the gunman in the Blimpie's robbery, and to have found him guilty of counts three and four of the information. Broderick had the opportunity briefly to observe the face of the gunman as he was coming through the door and pulling down his mask. The jury repeatedly heard Broderick positively identify the defendant as the individual who had entered Blimpie's on April 11, 2001, and had robbed the store at gunpoint. Broderick further testified that she had "no question" that the defendant was the gunman in the Blimpie's robbery. She stated that she had been able to "get a good look" at the armed assailant's face as he had entered Blimpie's, and that she had been specifically mindful of her father's instructions to focus on distinctive features of the individual's face because she had been conscious of the fact that she might be called upon to make a personal identification.

Additionally, both Broderick and Steck testified that, prior to trial, Broderick had, on two separate occasions, attempted to identify the armed assailant. She had reviewed hundreds of photographs as part of her first meeting with police and had not seen any photographs that looked even close to the individual who had robbed Blimpie's and had threatened her at gunpoint. Only after returning to meet with the police a second time, on May 30, 2001, did Broderick make a positive identification of the defendant from a properly presented photographic array. Both at the time of the photographic identification and at trial, Broderick stated that she was "completely certain" of her identification of the defendant as the armed assailant in the Blimpie's robbery. She signed a written statement to that effect, reviewed a photocopy of the photographic array presented by Steck, and circled the defendant's photograph to document her identification, which was ultimately submitted

as an exhibit to the jury. The jury also heard Steck describe the procedures used to administer the photographic array to Broderick, as well as Broderick's confirmation of the fact that neither Steck nor any other member of the police department attempted to influence her identification of the defendant as the gunman.

The defendant articulates two challenges to the sufficiency of the evidence presented at trial used to identify him as the gunman in the Blimpie's robbery. First, because the lower part of the assailant's face was covered by a mask during the robbery, the defendant contends that it was "logically impossible" for Broderick to identify him as the Blimpie's gunman on the basis of the shape and coloration of his lips, both as part of a police photographic array, and at trial. Specifically, the defendant claims that Broderick inconsistently described the time frame in which she was able to observe the face of the armed assailant, and that the period when she was actually able to perceive the gunman's face was at most a few seconds, which was too brief a period of time to allow her to observe distinctive facial features and subsequently to identify the defendant on the basis of those characteristics. Second, the defendant contends that the additional evidence presented at trial regarding his identification as the armed assailant in the Blimpie's robbery, namely, the remaining statements of Broderick and the Blimpie's surveillance videotape, were insufficient to support a conviction because they did not contain any factual evidence that the defendant was the armed assailant in the robbery. These claims are without merit.

At trial, Broderick repeatedly stated that she had the opportunity to observe the faces of the two individuals as they were pulling down their masks while running through the door, and that she "was able to get a good look at them." As we stated in *State* v. *Ledbetter*, supra, 185 Conn. 615, the fact that this opportunity was brief

does not make it impossible for Broderick to have made a meaningful identification on the basis of her observation. Therefore, rather than demonstrating "logical impossibility," the defendant's argument essentially is an attempt to call into question the quality of Broderick's recollection and her credibility as a witness, which, as we stated previously, is a subject matter that is not appropriate for this court to review. Additionally, in light of Broderick's repeated decisive and confident identifications of the defendant, it was reasonable for the jury to infer that the defendant was the individual observed in the Blimpie's surveillance videotape robbing the store and threatening Broderick at gunpoint. Furthermore, from Broderick's testimony that she initially had failed to identify the assailant following her extensive review of more than 100 suspect photographs, it was reasonable for the jury to infer that she was thoughtful in her review and mindful of specific physical characteristics of the gunman that she had observed during the robbery, rather than merely interested in selecting someone with a superficial resemblance to the defendant.

The defendant's second contention fails to recognize that it is a jury's responsibility to view the evidence as a whole and "[i]f it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Gary*, supra, 273 Conn. 405. Therefore, although not necessarily dispositive of the defendant's identity in their own right, when viewed in conjunction with Broderick's repeated identifications of the defendant, the security surveillance videotape and Broderick's addi-

tional testimony both add to the cumulative weight of the evidence against the defendant that was presented at trial.

The judgment is affirmed.

In this opinion the other justices concurred.