## STATE OF CONNECTICUT *v.* CARLETON SMITH
### (SC 17309)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued February 8—officially released October 10, 2006

*Proloy K. Das*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Kimberley N. Perrelli*, senior assistant state's attorney, for the appellant (state).

*James B. Streeto*, assistant public defender, for the appellee (defendant).

*Opinion*

BORDEN, J. The dispositive issue in this certified appeal is whether the trial court properly concluded that certain evidence proffered by the defendant was inadmissible under General Statutes § 54-86f, commonly known as the rape shield statute.[1] The state

---

[1] General Statutes § 54-86f provides in relevant part: "In any prosecution for sexual assault under sections 53a-70, 53a-70a, and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. Such evidence shall be admissible only after a hearing on a motion to offer such evidence containing an

appeals, following our grant of certification, from the judgment of the Appellate Court affirming in part and reversing in part the judgment of the trial court convicting the defendant, Carleton Smith, of three counts of the crime of risk of injury to a child, two counts each of the crimes of sexual assault in the first degree as an accessory and sexual assault in the second degree, and one count each of the crimes of aggravated sexual assault in the first degree, sexual assault in the first degree and failure to appear in the first degree.[2] The Appellate Court affirmed the judgment of the trial court only as to the conviction of failure to appear in the first degree;[3] the Appellate Court reversed the judgment as to the conviction of all the other charges and remanded the case to the trial court for a new trial as to those charges only. *State* v. *Smith*, 85 Conn. App. 96, 115, 856 A.2d 466 (2004).

The state claims that the Appellate Court improperly: (1) reversed the judgment of conviction based on the trial court's failure to hold an evidentiary hearing pursuant to § 54-86f; (2) concluded that § 54-86f requires that

offer of proof. On motion of either party the court may order such hearing held in camera, subject to the provisions of section 51-164x. If the proceeding is a trial with a jury, such hearing shall be held in the absence of the jury. If, after hearing, the court finds that the evidence meets the requirements of this section and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. . . ."

[2] We granted the state's petition for certification to appeal limited to the following issues: (1) "Did the Appellate Court properly reverse the judgment of conviction based upon the trial court's failure to hold an evidentiary hearing pursuant to General Statutes § 54-86f?"; (2) "Did the Appellate Court properly conclude that General Statutes § 54-86f (1) requires that a defendant be permitted to introduce evidence of any semen that is found on the victim?"; and (3) "Did the Appellate Court properly conclude that a defendant whose defense is misidentification must be permitted to present evidence of semen from a third party without having to first show the relevance of that semen to the sexual assault?" *State* v. *Smith*, 271 Conn. 945, 861 A.2d 1178 (2004).

[3] The judgment of conviction for failure to appear in the first degree is not at issue in this certified appeal.

a defendant be permitted to introduce evidence of any semen that is found on the victim; and (3) concluded that a defendant whose defense is misidentification must be permitted to present evidence of semen from a third party without first having to show the relevance of that semen to the sexual assault. Because we agree with the Appellate Court that the trial court improperly precluded the semen evidence offered by the defendant, we affirm the judgment of the Appellate Court.

As part of a twelve count information, the defendant was charged with aggravated sexual assault in the first degree in violation of General Statutes §§ 53a-70a (a) (4) and 53a-70 (a) (1), sexual assault in the first degree in violation of § 53a-70 (a) (1), two counts of sexual assault in the first degree as an accessory in violation of General Statutes §§ 53a-8 (a) and 53a-70 (a) (1), one count each of conspiracy to commit sexual assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-70 (a) (1), and attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1), two counts each of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (2), and one count each of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1) and failure to appear in the first degree in violation of General Statutes § 53a-172 (a) (1). Prior to trial, the trial court denied the defendant's motion for an evidentiary hearing pursuant to § 54-86f. The jury subsequently found the defendant guilty on all but the attempt and conspiracy charges, and the trial court rendered judgment in accordance with the verdict. The defendant received a total effective sentence of thirty-eight years imprisonment and was required for life to register with the sex offender registry. On appeal, the Appellate Court affirmed the judgment only as to the

conviction for failure to appear and reversed the judgment as to the conviction of all the other charges. *State v. Smith*, supra, 85 Conn. App. 115. This certified appeal followed.

The opinion of the Appellate Court sets forth the following relevant facts and procedure. "The complaining witness, a thirteen year old runaway girl, T,[4] testified that she was walking on a Hartford street when she was asked if she 'wanted to chill' with three men in a car, driven by a man she later identified as the defendant. She did not know any of them, but got into the car. The defendant drove to a package store where the men bought liquor. All of them, including the minor, smoked marijuana and drank as the defendant drove. Eventually, they went to the Travelers Inn in East Hartford where the driver rented a room and all of them went into it.

"T further testified that the driver of the car pushed her onto the bed and removed her clothing. He had vaginal sexual intercourse with her while the other two men held her arms. Each man in turn had vaginal sexual intercourse with her and later each had vaginal sexual intercourse from behind her while she was forced to lie on her stomach. T also testified that the defendant tried to make her perform fellatio on him. After the trio had ended their sexual assaults, she was driven to a park. One of the men, not the defendant, got out of the car with her, put a gun to her head and said he would kill her if she told anyone about what had happened. She called the police from a nearby Laundromat, however, and originally stated that one man had raped her in a park. She later told the police of her encounter with the three men.

---

[4] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

"T identified the motel at which the assaults had occurred, and the police, after investigation, discovered that the defendant had rented a room there on the same day as that of the assaults described by T. She identified that room to the police as one of four possible rooms that were the site of the assaults. At first, T failed to identify the defendant as one of her assailants from a photographic array, but a few days later did identify him from the array. Later, T made positive photographic identifications of her other two assailants, after the defendant had identified the other two men to the police as having been with him on the day in question. T, in prior statements to the police, stated that she had had sexual intercourse with others during the days immediately preceding the events of this case.

"The defendant, having been read his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), told a detective that he had picked up a girl when he was driving around Hartford with two other men he identified and that he had gone to the Travelers Inn and rented a room. He and the unidentified girl entered the room where he had consensual sexual intercourse with the girl, during which he used a condom. He then left and remained outside the room while the other two men then entered the room. He did not admit that the girl was T and was not provided with T's name, nor was he asked to identify a photograph of her." State *v.* Smith, supra, 85 Conn. App. 100–101.

The additional procedural history is relevant to the resolution of this appeal. In his April 11, 2002 amended motion for an evidentiary hearing pursuant to § 54-86f, the defendant stated that he sought the hearing in order to obtain a determination regarding the admissibility of evidence of T's prior sexual conduct. Prior to trial, on April 23, 2002, during argument before the trial court on the motion, the defendant clarified that he sought the hearing to determine, among other things, the

admissibility of a DNA report that had been prepared by the Connecticut department of public safety forensic science laboratory based on its analysis of semen samples taken from T as part of the rape kit that was collected on the night of the assault. At that time, the defendant contended only that the report was relevant to impeach the credibility of T by showing that she had had sexual encounters with persons other than the defendant in the days prior to the rape. The trial court stated that it would rule on the defendant's motion on May 1, 2002, the first day of trial.

On May 1, 2002, before beginning to hear evidence, the court denied the defendant's motion for an evidentiary hearing pursuant to § 54-86f. The court gave the parties copies of its memorandum of decision detailing its ruling and explained orally to the parties that it had denied the defendant's motion based on its conclusion that the defendant had failed to meet his burden of showing that the proffered evidence was relevant to the case. In part, the trial court relied on the state's expressed intention not to present any semen evidence in its case against the defendant. Upon hearing the court's decision on the motion, the defendant orally moved for reconsideration, arguing that he was entitled to an evidentiary hearing pursuant to § 54-86f (1) because the DNA evidence "clearly shows that all three of the alleged assailants were excluded by the state's forensic evidence," and that the evidence was "extremely relevant to the question as to whether or not [the defendant] was involved in sexually assaulting this young woman." The court orally denied the defendant's motion for reconsideration, remarking that it did not view this contention by the defendant to constitute a new argument beyond those that the defendant already had advanced in his motion in limine and in argument on the motion on April 23, 2002.

On May 7, 2002, after the state rested its case, the defendant sought to have admitted the testimony of Michael Adamowicz, a criminalist with the Connecticut department of public safety forensic science laboratory, who conducted the tests on the material in the rape kit collected from T on the night of the assault, namely, anal swabs taken from T and cuttings from one of her socks worn on the night of the assault. In his offer of proof in support of the introduction of the testimony of Adamowicz, the defendant stated that he sought to have Adamowicz testify that the tests of those materials revealed the presence of sperm rich fractions, from at least two persons, the DNA of which was not attributable to the defendant or the other two alleged assailants. In his argument in support of his offer of proof, the defendant advanced only the purpose, barred under § 54-86f, of challenging the credibility of T by showing, through the expert testimony regarding the DNA report, that she had had sexual encounters with other persons in the days immediately prior to the assault. During the colloquy between defense counsel and the trial court on the issue of the admissibility of the testimony of Adamowicz concerning the DNA report, however, the defendant himself interjected the following statement: "I'm not trying to have no rape hearing. *I'm trying to prove that I ain't did nothing to this young lady.* That's it. I don't care about no hearing." (Emphasis added.)

Before allowing Adamowicz to testify in the trial, the court first heard his testimony outside the presence of the jury, stating that it was doing so in order to allow the defendant to create a record on appeal. During questioning, Adamowicz stated that tests conducted of the samples collected from T in the rape kit revealed the presence of sperm rich fractions, the genetic profile of which did not match the DNA of either the defendant or the other two alleged assailants in the present case. He further testified that the sperm rich fraction present

in the anal swabs was composed of a mixture from at least two people, neither of whom was any of the three alleged assailants or T. It was possible to determine only that at least one of the contributors to the anal swab samples was male; the tests could not eliminate the possibility that one of the contributors could be female.[5] As for the sample taken from one of the sock cuttings, tests conducted on that sample also revealed the presence of a sperm rich fraction with a genetic profile that did not match the DNA profiles of any of the three alleged assailants. There were at least two, probably three contributors to that particular sample, at least one of whom was male. The defendant and the other two alleged assailants were also excluded from the sample taken from the other sock cutting. After hearing the offer of proof, the court announced its decision that Adamowicz would be allowed to testify only that the testing of the samples taken from the rape kit did not reveal any genetic material linked to the defendant, and the court ordered that the DNA report be redacted consistent with the limited scope of the testimony.

After the defendant rested his case, he renewed his objection, based on § 54-86f (1), both to the limitation of the expert testimony and to the redaction of the DNA report. The trial court overruled the objection, reiterating the rationale underlying its initial reasoning, that the admission of both the expert testimony and the DNA report had been limited in scope consistent with the requirements of § 54-86f, due to the lack of relevance of the semen evidence.

The state claims that the Appellate Court improperly concluded that the trial court improperly barred the

---

[5] Because neither the defendant nor the state asked Adamowicz to clarify this point, it is unclear from the record exactly how the samples that included sperm rich fractions could have originated in part from a female contributor.

introduction of the unredacted DNA report and expert testimony regarding the semen samples analyzed in the report. We disagree. We conclude that under the particular facts of the present case, the evidence was admissible under § 54-86f (1) because it was relevant to the issue of whether the defendant was the source of semen, and, therefore, to his defense of misidentification.

We first note that, because the trial court ultimately held an evidentiary hearing to determine whether the defendant's proffered evidence was admissible under § 54-86f, it is unnecessary for us to resolve the first certified question.[6] Section 54-86f provides for a two step process before evidence proffered by a defendant as falling under one of the statute's exceptions may be admitted. First, if the defendant has satisfied his preliminary burden in his offer of proof to show that the evidence is potentially relevant, pursuant to the statute the trial court must conduct a hearing to deter-

---

[6] We note that the Appellate Court also addressed the issue of whether the defendant was entitled to an evidentiary hearing under § 54-86f (4), which creates an exception for proffered evidence that is "otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights." Because, as we explain in this opinion, we conclude that the trial court did, in fact, hold an evidentiary hearing in order to determine whether and to what extent the defendant's proffered evidence was admissible, we do not address the effect of this provision in our analysis of the issues presented in this certified appeal. Furthermore, because we resolve the appeal under subsection (1) of § 54-86f, we decline to consider whether subsection (4), which codifies constitutional law, would require the evidence to be admitted. Instead, "[w]e . . . follow the recognized policy of self-restraint and the basic judicial duty to eschew unnecessary determinations of constitutional questions." (Internal quotation marks omitted.) *State* v. *Rinaldi*, 220 Conn. 345, 353, 599 A.2d 1 (1991).

In addition, our conclusion that the trial court held the requisite evidentiary hearing pursuant to § 54-86f renders it unnecessary for us to address the state's claim that the defendant did not preserve his claim that he was entitled to such a hearing.

mine the admissibility of the evidence.[7] Second, "[i]f, after hearing, the court finds that the evidence meets the requirements of this section and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. . . ." General Statutes § 54-86f.

In the first step of this two part process, the defendant bears the burden of showing that the proffered evidence overcomes the presumption, inherent in § 54-86f, that evidence of the sexual conduct of a rape victim is inadmissible and satisfies the statute's requirement that only evidence relevant to the case, rather than evidence relevant merely to demonstrate the unchaste character of the victim, be admissible. The legislative history of the statute illustrates the particular focus demanded by the statute. In discussing the bill that eventually became the rape shield statute, Senator Howard T. Owens, Jr., made the following remarks: "What this [b]ill really does is and when [you] get to the heart of it, is that we want to make certain that when someone is called upon, testifying in a criminal prosecution of serious sexual offenses or rapes specifically, that they can't get into the woman's background; they can't ask her whether or not she uses a diaphragm. They can't ask her whether or not she's involved in birth control; whether or not she's had sexual—how many times she's been married, what her customs are and what her preferences are to sex; all of these types of questions *that have no relevancy to the situation before the [c]ourt; whether or not in fact a rape occurred.*" (Emphasis added.) 25 S. Proc., Pt. 10, 1982 Sess., pp. 3249–50.

---

[7] In defining the nature of the defendant's preliminary burden, we find instructive and useful the description articulated by the Appellate Court in *State* v. *Manini*, 38 Conn. App. 100, 114, 659 A.2d 196, cert. denied, 234 Conn. 920, 661 A.2d 99 (1995), namely, that to satisfy his burden, "[t]he [defendant's] showing must be sufficient to enable the trial court to make an informed ruling in connection with the exercise of its discretion on the issue."

If the trial court determines that the evidence is relevant and admissible under one of the exceptions enumerated in § 54-86f, the trial court must proceed to the second part of the two part process outlined in the statute. That is, the evidence is admissible only if its probative value outweighs the prejudicial impact on the victim. In the present case, because the trial court determined that the defendant's proffered evidence did not fall under one of the enumerated exceptions of § 54-86f, it did not perform this balancing test. Because we arrive at the opposite conclusion, we will address the issue, following our discussion of whether the proffered evidence falls under the source of semen exception.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." (Internal quotation marks omitted.) *State* v. *Tutson*, 278 Conn. 715, 748–49, 899 A.2d 598 (2006). In considering whether evidence was sufficiently relevant to fall under one of the exceptions enumerated in § 54-86f, we have drawn a distinction between, on the one hand, evidence that is relevant to establish some portion of the theory of defense or rebut some portion of the state's case, which is admissible if the court determines that the probative value of the evidence outweighs its prejudicial impact on the victim, and, on the other hand, evidence that is offered as an impermissible attempt to establish the victim's "general unchaste character as prohibited by the rape shield statute." *State* v. *DeJesus*, 270 Conn. 826, 839, 856 A.2d 345 (2004), citing H. Galvin,

"Shielding Rape Victims in the State and Federal Courts: A Proposal for the Second Decade," 70 Minn. L. Rev. 763, 807 (1986).

The hearing that the court conducted on May 7, 2002, during which it heard Adamowicz' testimony, as well as arguments of counsel, was essentially a hearing pursuant to § 54-86f, as evidenced by the trial court's consistent emphasis, during the proceeding, on the admissibility of the evidence only insofar as it was relevant to the sexual assault that was at issue in the case. Although the trial court characterized the proceeding as having the purpose of allowing the defendant to preserve a record for appeal, the testimony, counsel's arguments and the trial court's remarks make clear that the hearing accomplished the very purpose that a hearing pursuant to § 54-86f is designed to serve. That purpose is to assist the trial court in making its determination regarding whether the evidence is relevant to the case and falls within one of the statute's exceptions, and whether its probative value outweighs the prejudicial impact on the victim. Specifically, after hearing Adamowicz' testimony and the arguments of counsel, the trial court had before it all the information necessary to make a determination whether the proffered evidence and testimony were admissible under § 54-86f (1). The court had heard testimony regarding the significance of the DNA report. The court also had before it both bases upon which the defendant sought to have the evidence admitted: the impermissible basis of using the DNA report to impeach T's credibility by establishing that she had had sexual encounters with strangers immediately prior to the assault; and the basis articulated by the defendant, both in his oral motion for reconsideration of the trial court's decision denying his motion for an evidentiary hearing and in his outburst during the evidentiary hearing itself, that it was not he who committed the crime.

The court did, in fact, base its determinations, namely, that the report be admitted in redacted form only and that the accompanying expert testimony should be similarly limited, on the considerations underlying § 54-86f; that is, that only evidence relevant to the case, rather than evidence designed merely to cast the character of T as generally unchaste, be admitted. Prior to hearing Adamowicz' testimony, the trial court posed this question to defense counsel: "Why would such evidence . . . be relevant to the case? . . . [W]hy would it be relevant to the issue of whether your client engaged in the conduct that is charged against him in the information?" The court thus made clear that the factor that would guide it in determining whether to allow the testimony was whether the testimony was relevant. Furthermore, in limiting the scope of the expert testimony, the trial court articulated its concern "to avoid . . . anything that would raise in the jury's mind the question as to whether the alleged victim in this case has engaged in any sexual conduct with anyone other than the people—the defendant in this case." By making clear that it would not permit any exploration into the irrelevant and impermissible issue of whether T had engaged in sexual encounters prior to the assault, the court signaled that its concern was to allow only evidence that it considered relevant to the case. During the proceeding, the court also repeatedly clarified that its ruling limiting the scope of expert testimony and redacting the DNA report was based on its concern that nothing be admitted into evidence in violation of § 54-86f. Thus, despite the court's characterization of the hearing as one designed to preserve the defendant's record on appeal, it served precisely the purpose intended by a hearing conducted pursuant to § 54-86f.

We now turn, therefore, to the dispositive issue in this appeal, namely, whether the Appellate Court properly

concluded that the DNA report and the expert testimony should have been admitted without the limitation that the expert not be allowed to mention semen and that the DNA report should be redacted accordingly.[8] We agree with the Appellate Court that the report and the testimony should have been admitted without the limitations.

"[T]he rape shield statute . . . was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material." (Internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 176, 777 A.2d 604 (2001). "It reflects the modern understanding that a victim's prior sexual conduct is generally irrelevant." *State* v. *Malon*, 96 Conn. App. 59, 74, 898 A.2d 843 (2006). The policy reasons underlying the statute include "protecting the victim's sexual privacy and shielding her from undue harassment, encouraging reports of sexual assault . . . enabling the victim to testify in court with less fear of embarrassment . . . [and] avoiding prejudice to the victim, jury confusion and waste of time on collateral matters." (Internal quotation marks omitted.) *State* v. *DeJesus*, supra, 270 Conn. 836. The statute delineates four exceptions to the presumption that evidence of prior sexual conduct

---

[8] We have reframed the statement of the second and third certified questions as a single question. See footnote 2 of this opinion. Although we rephrase the certified questions, it is important to clarify two issues. First, we do not intend, in this opinion, to imply, as the state's argument suggests, that we conclude that *any* semen that is found on a victim will always be admissible pursuant to § 54-86f (1). We conclude only that under the particular circumstances of this case, the semen evidence was admissible. Second, our decision today does not mean that a defendant whose defense is misidentification must be permitted to present evidence of semen from a third party without first having to show the relevance of that semen to the sexual assault. Our analysis makes clear that we conclude that the evidence proffered by the defendant in the present case should have been admitted because the defendant had met his burden to show that the evidence was relevant, under the particular circumstances of this case, to his defense of misidentification.

of a sexual assault victim is inadmissible, and further provides that evidence that falls under one of the four exceptions is "admissible only after a hearing on a motion to offer such evidence containing an offer of proof. . . ." General Statutes § 54-86f. Furthermore, if the trial court determines, following the hearing, that the proffered evidence falls under one of the exceptions, the evidence is admissible only if its probative value outweighs its prejudicial effect on the victim. General Statutes § 54-86f.

The exception that is at issue in the present case is § 54-86f (1), which provides in relevant part that, "[i]n any prosecution for sexual assault under sections 53a-70, 53a-70a, and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible unless such evidence is . . . offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen . . . ." Therefore, under the standard we have just articulated, in order to satisfy his burden to show that the proffered evidence was admissible under this exception, the defendant was required to show that the semen was relevant to establish some portion of the defense's theory or to rebut some portion of the state's case, rather than merely to establish T's general unchaste character.[9] Accordingly, we agree with the trial court that one

[9] We disagree with the trial court's suggestion that the only circumstance under which the defendant's proffered evidence would be admissible would be when the state relied on semen evidence in its case-in-chief. Section 54-86f (1) does not limit the defendant to introducing semen evidence in rebuttal. It is sufficient that the defendant establish the relevance of the semen evidence to the case, either as relevant to the defendant's rebuttal of the state's case, or in support of the defendant's theory of defense. The state correctly summarizes the significance of the state's introduction of semen evidence. If the state does introduce such evidence as part of its case-in-chief, it is presumptively relevant, and the defendant has a right to address it. In the absence of the state's introduction of the semen evidence, it becomes incumbent upon the defendant to establish the relevance of the evidence pursuant to § 54-86f (1) before being allowed to present such evidence as part of his defense.

of the reasons proffered by the defendant in support of the admissibility of both the DNA report and the related expert testimony was impermissible under the rape shield statute, namely, to impeach T's credibility by showing that she had had sexual encounters with strangers prior to the assault. Under that theory, the DNA report was irrelevant to the defendant's case and such a use of the evidence would have been precisely the type of use that the rape shield statute is designed to prohibit. That the defendant advanced an impermissible reason in support of his motion for an evidentiary hearing pursuant to § 54-86f (1), however, does not render his second basis for admissibility of the report and the expert testimony irrelevant, and therefore inadmissible.

It is black letter law that in any criminal prosecution, the state bears the burden of proving beyond a reasonable doubt the defendant's identity as one of the perpetrators of the crime charged. See, e.g., *State* v. *Morgan*, 274 Conn. 790, 798, 877 A.2d 739 (2005). In the present case, the defendant's only theory of defense was misidentification.[10] He did not raise consent as a defense, and he did not contest that T had engaged in intercourse with someone. Rather, he contended that *he* did not do it; that T had misidentified him; and that the state had failed to meet its required burden to show that he was one of the persons who had assaulted T.

In support of his theory of misidentification, the defendant emphasized that T did not identify him in the initial photographic array and that her courtroom identification of him was tentative at best. He further

---

[10] The state claims that the defendant did not offer a defense of misidentification at the trial court. Given the extensive support in the record to the contrary, we disagree. The entire thrust of the defendant's case, from his pretrial motion to the questioning of the witnesses to the closing argument by defense counsel, relied on the defendant's theory that T incorrectly identified him as one of the perpetrators of the assault and that the state had failed to meet its burden to show that he was one of her assailants.

questioned T's ability accurately to recall and describe what happened on the night in question because she had been consuming alcohol and smoking marijuana that evening. He called attention to the fact that, initially, T did not recall the town where her assailants had taken her, and that she identified the motel where the assaults took place only after the police drove her past the Travelers Inn. He also emphasized at various points in the trial T's failure, during the incidents immediately prior to the attack and during the attack itself, to look at the assailants. Additionally, he impeached T's credibility by pointing to the fact that she had initially told an entirely different story to the police, namely, that she was raped in Keeney Park by a single assailant. He also, in accordance with the court's ruling limiting the extent to which he could use the DNA report, introduced expert testimony that the defendant did not contribute "any genetic material" that was recovered in the rape kit collected from T on the day of the assault. In closing argument, defense counsel emphasized repeatedly that the state had failed to meet its burden to show that the defendant was one of T's assailants, at one point stating: "I submit to you that [T] has not identified [the defendant] as her attacker beyond a reasonable doubt. And the state's observation that [T] was extremely upset may very well indicate that there was an assault, that she was understandably upset by it, but *doesn't go to prove that [the defendant] was one of the people who conducted that assault.*" (Emphasis added.)

The DNA report and the testimony of Adamowicz regarding the report were both highly relevant to the defendant's theory of misidentification. "We have recognized consistently that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant

must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 262–63, 796 A.2d 1176 (2002). Indeed, in *Cerreta*, in determining whether evidence that a third party's hair and fingerprints were found at the scene of the crime was relevant and therefore admissible, we concluded that such evidence "clearly" amounted to "more than a bare suspicion," and satisfied the requirement that such evidence "directly connect a third party to the crime." Id., 263. Such evidence is relevant, exculpatory evidence, rather than merely "tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt." Id., 262.

It is stating the obvious to say that the DNA report, which revealed that the only samples of semen recovered from the rape kit collected from T on the night of the assault came from at least two persons, and that neither the defendant nor the two other alleged assailants contributed the semen, would have been sufficient to satisfy the defendant's burden to show that the evidence was relevant to his theory of misidentification. Certainly, such evidence, similar to the presence of a third party's hair and fingerprints at the crime scene, amounts to more than a "bare suspicion" that a third party may have committed the crime. The defendant drew this connection for the court in his oral motion for reconsideration when he claimed that the DNA report "clearly shows that all three of the alleged assailants were excluded by the state's forensic evidence," and that the evidence was "extremely relevant to the question as to whether or not [the defendant] was involved in

sexually assaulting this young woman." The defendant himself, during the colloquy between the court and defense counsel concerning whether and to what extent the expert testimony would be admitted, once again linked the introduction of the expert testimony and the DNA report by interjecting that he was merely trying to "prove that I ain't did nothing to this young lady." Moreover, by the time the court made its ultimate determination that the DNA report and the expert testimony were not, except in redacted form, admissible, the defendant had established his defense as one based solely on his claim that T had misidentified him, and that the state had failed to meet its burden to show beyond a reasonable doubt that he was one of the perpetrators of the crime. At that point in the trial, given the defendant's exclusive focus on his claim of misidentification, it was not necessary for him to "connect the dots" further. The significance of both the report and the expert testimony based on the report, within the context of the entire trial, was self-evident. The presence of the semen of two individuals on samples taken from the rape kit was highly probative of whether the state had met its burden to establish the identity of the defendant as one of the perpetrators of the crime. Furthermore, given the highly probative nature of the semen evidence, taken together with our agreement with the trial court's conclusion that the evidence could not be used simply to show that T had had sexual encounters with strangers in the days prior to the assault, the probative value of the evidence outweighs any prejudicial impact on T.

The state claims that the DNA report was not relevant to the identity of the attacker because of the location of the semen samples, on T's sock and her anus. We disagree. Specifically, the state contends that because the sexual assault involved only vaginal intercourse, only semen found in her vagina reasonably could have

come from the sexual assault, and, therefore, the state argues that there is nothing that logically connects the semen samples collected from the rape kit to the assault of T. The state makes much of the fact that the Appellate Court noted that, at one point in the investigation of the assault, T had stated that the second round of assaults were penile-anal, but that the source of that statement was a police report that was never introduced into evidence. The state argues that the statement should not be considered part of the record, relying on the assumption that the semen sample found on the anal swab would be relevant only if there had, in fact, been penile-anal penetration.

This assumption is incorrect. We need not go into specific detail to demonstrate that vaginal intercourse from the rear may result in the deposit of semen on or in T's anus, or that either anal intercourse or vaginal intercourse from the rear may result in the deposit of semen on socks worn by T. In short, the state's assumption ignores the fact that sexual intercourse, particularly when it is of a violent nature such as that described by T, is seldom neat.

We also are unpersuaded by the state's contention that allowing the introduction of the semen evidence in the present case will expose unnecessarily the sexual history of sexual assault victims. As we have stated repeatedly throughout this opinion, the semen evidence offered by the defendant was admissible solely for the purpose of supporting his defense of misidentification, not for the impermissible purpose of impeaching T's credibility by establishing that she had engaged in sexual activity with strangers immediately before the assault. Given the narrow purpose for which we have concluded the semen evidence was admissible, there is minimal risk that T's sexual history would be unnecessarily exposed.

The remaining question we must resolve is whether the defendant has satisfied his burden of proving that the trial court's ruling constituted harmful error. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 352, 904 A.2d 101 (2006). We have recently stated that "a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 357. Because we do not have a fair assurance that the error in the present case did not substantially affect the verdict, we conclude that the error was harmful.

The state's case against the defendant was substantial. T testified that on January 25, 1999, as she was walking on the streets of Hartford, three black men in a black car pulled up alongside her and asked her if she "wanted to chill." She identified the defendant in the courtroom as the driver of the car and stated that it was he who walked into the office at Travelers Inn to rent the motel room where the three men took her.

She further testified that when she described the driver of the car to an East Hartford police officer during an interview at the hospital after the assault, she told the officer that the driver had a gold tooth on the top part of his mouth. Officer Hardie Burgin of the East Hartford police department testified that, before the defendant was arrested, Burgin observed the defendant in a public place and noticed that he was missing a tooth in the front top of his mouth. Inspector Ann Velazco of the office of the chief state's attorney, who arrested the defendant in connection with the charge against him for failure to appear in the first degree, testified that she noticed that the defendant had silver metal on a tooth in the top front left of his mouth.

When officers drove T around in East Hartford, she was able to identify the Travelers Inn as the motel where the assault occurred and was able to narrow down to four possibilities the room where she had been attacked. Although she did not identify the defendant during the first photographic array, the second time she was shown the photographic lineup, she identified the defendant as the driver of the car. She also had identified the defendant's two associates as her remaining attackers. Burgin testified that T had described the other two assailants as Jamaicans, one tall and the other short. He further testified that the defendant had rented, on the night that T was assaulted, one of the rooms she had identified as a possible site of the assault. Of the remaining three rooms identified by T, two were unoccupied that night and the last was rented by a regular customer of the motel.

Burgin further testified that when the police took the defendant in for questioning, the defendant stated that on the night of the assault, he was driving around in his sister's car with two Jamaicans. They picked a female up and went to the Travelers Inn, where the defendant paid for the room. The two Jamaicans stayed in the car while the defendant went into the room with the female, where the two had sexual intercourse. He stated that he wore a condom during intercourse and that he noticed that she was menstruating.[11] When he was finished, he went out to the car and the two Jamaicans went into the motel room. He identified his two associates, Todd Artest and Desmond Gordon, as the same two individuals who T had identified to police as her two other assailants.

---

[11] Leslie Dick, the physician who examined T on the night of the assault, testified that T was bleeding from her vagina at the time of the examination. T's testimony was, at various times, inconsistent as to whether she was menstruating at the time of the assault. On the basis of her examination of T, Dick could not say with certainty what caused the bleeding and could not rule out the possibility that T was menstruating.

Despite the strength of the state's case against the defendant, the persuasive force of DNA evidence cannot be ignored. As the Appellate Court aptly noted, the DNA report was "the most compelling evidence" available to the defendant in support of his defense of misidentification. *State* v. *Smith*, supra, 85 Conn. App. 110. When a defendant asserts that he was not the perpetrator of a sexual assault and that the victim has misidentified him as one of her attackers, evidence that the only semen recovered from the victim on the night of the assault reveals the DNA of at least two persons who are not among those accused of the crime would give any reasonable juror pause before concluding that the state had proved beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime.

By comparison, the limited purpose for which the report and the related expert testimony were admitted rendered them poor substitutes. When Adamowicz testified concerning the DNA report, he was allowed to state only that in the course of his testing the materials collected in the rape kit, the defendant was "excluded as a contributor or source of any of the genetic profiles that [Adamowicz] detected . . . ." The DNA report was redacted to exclude any reference to semen. Essentially, then, the jury was not informed that *any* semen was discovered on the items in the rape kit. Instead, they were told only that "genetic material" was tested and that the defendant did not contribute any of the genetic material. From such vague information, the jury reasonably could have inferred that the defendant failed to deposit any physical material during the sexual assault, and that the genetic material tested matched the DNA of T, not some third party.

The likelihood that the jury drew such a limited inference was increased by the testimony of Burgin, one of the investigating officers in the case. He testified that he had investigated approximately 250 sexual assault

cases. In those 250 cases, a rape kit was collected in approximately only twenty cases. Additionally, in only some of those twenty cases was physical evidence of the defendant recovered. On the basis of this testimony, the jury reasonably could have inferred that, during the assault, the defendant simply left no physical evidence capable of revealing the presence of his DNA—an occurrence that, according to Burgin's testimony, was not uncommon.

Given the significant difference between the impact that the permitted testimony and evidence had on the jury, compared with the likely impact of the admission of the unredacted report and similarly unrestricted expert testimony, we do not have a fair assurance that the error did not substantially affect the verdict. Therefore, we conclude that the error was harmful.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.