******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## STATE OF CONNECTICUT *v.* LARRY MAKINS
## (AC 46810)

Bright, C. J., and Alvord and Seeley, Js.*

*Syllabus*

Convicted, after a jury trial, of burglary in the first degree and attempt to commit sexual assault in the first degree, the defendant appealed to this court. He claimed that the trial court improperly denied his motion for a judgment of acquittal, made at the close of all the evidence, because the evidence adduced at trial was insufficient to establish beyond a reasonable doubt his identity as the perpetrator of the crimes of which he was convicted. *Held*:

The trial court properly denied the defendant's motion for a judgment of acquittal, as the state presented sufficient evidence from which the jury could have found beyond a reasonable doubt that the defendant was the person who entered the victim's apartment, engaged in the physical altercation with the victim, and attempted to sexually assault her.

Argued January 7—officially released April 22, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of burglary in the first degree and attempt to commit sexual assault in the first degree, brought to the Superior Court in the judicial district of New Haven, geographical area number twenty-three, and tried to the jury before *Vitale, J.*; thereafter, the court, *Vitale, J.*, denied the defendant's motion for a judgment of acquittal; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*John R. Weikart*, assigned counsel, with whom were *James P. Sexton*, assigned counsel, and, on the brief, *Emily Graner Sexton* and *Tamar Birckhead*, assigned counsel, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom, on the brief, were *John Doyle*, state's attorney,

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

and *Stacey Miranda*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, Larry Makins, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the first degree in violation of General Statutes § 53a-101 (a) (3) and attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1). On appeal, the defendant claims that the court improperly denied his motion for a judgment of acquittal, made at the close of all the evidence, because the evidence adduced at trial was insufficient to establish beyond a reasonable doubt his identity as the perpetrator of the crimes of which he was convicted. We disagree and, accordingly, affirm the judgment of the court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In April, 2019, the victim[1] lived on the second floor of a three-story multifamily home in New Haven. On the evening of April 10, 2019, she was asleep in her bedroom. Because she expected her children to return from school while she slept, the victim left the front door of her apartment unlocked so that they could enter the residence. At some point in the evening, the victim, feeling as though she was being watched, awoke to find the defendant standing over the edge of her bed. The defendant then began trying to hold the victim down on the bed, and she started punching him in an attempt to fight him off and escape. Unable to fight him off, the victim grabbed a glass statue that was by her bedside and hit the defendant over the head with it, causing it to shatter. This allowed the victim to run to her bedroom

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual violence, we decline to identify the victim. See General Statutes § 54-86e.

window, which she tried to open as she was yelling for help. The defendant kept trying to approach the victim, who continued to yell and scream for help, at which point she picked up a dresser in the room and threw it at the defendant. The victim then moved to the other side of her bed in an effort to evade the defendant, but he continued his pursuit. As he did so, the defendant pulled down his pants and underwear and told the victim that he was "going [to] get the pussy."

The victim subsequently grabbed hold of the defendant's penis and "tried to rip it off." In response, the defendant put her in a chokehold and demanded that she let go of his penis. The victim countered by telling the defendant to let go of her. This back and forth continued briefly before both parties ultimately let go of each other. After the defendant and the victim released each other, the defendant told the victim, "that's what you get for leaving your door unlocked," while moving backward toward the bedroom door. The victim then asked the defendant to call 911 because she could not breathe,[2] but after realizing that mentioning 911 caused the defendant to stop moving, she instead asked him to get her some water. The defendant retrieved a case of water bottles from the kitchen, threw it on the bed, and took a water bottle from the case. The victim concluded that she needed to get out of the apartment to escape the defendant and, aware that he was receptive to her requests, asked him to get her a wet rag from the bathroom, which was the farthest room from her bedroom. The defendant complied, and when he left the bedroom and headed toward the bathroom, the victim ran out of her apartment and downstairs to the first floor of the apartment building, where she began pounding on the apartment door of her neighbor, George Bennett, while pleading for help. When Bennett

---

[2] The victim testified that she was out of breath from fighting the defendant off.

answered the door, the victim ran into his apartment and "told him that some guy broke in[to] [her] house [and] tried to kill and rape [her] . . . ." While Bennett was closing the door to his apartment, the victim saw the defendant run out of her apartment and exit the multifamily home through the front door, leaving his water bottle behind. Bennett called 911, and he and his girlfriend stayed with the victim while they waited for the police to arrive. The victim sustained scratches to her right arm as a result of the incident.

Shortly thereafter, law enforcement and emergency medical personnel arrived at the scene. Upon arrival, New Haven Police Detective Brian DiAnge spoke with the victim and observed that there were "blood smears on her left arm" and "scratches on her right" arm. DiAnge subsequently obtained an initial statement from the victim and consent to search both her person and apartment,[3] after which he and the other responding officers secured the crime scene. DiAnge then requested assistance to process the crime scene, and Detective Steven Formica responded. Formica took photographs of the entire crime scene, including the exterior and interior of the victim's apartment, the overturned dresser in the victim's bedroom, an open water bottle and water bottle cap found on the first floor of the apartment building, the case of water bottles on the victim's bed, the scratches on the victim's right arm, and bloodlike smears on her left forearm and left hand near her thumb.[4] Formica also swabbed the scratches on the victim's arm and the bloodlike smear on her forearm and thumb and sent some of the samples to

---

[3] At some point, the victim also went to the New Haven Police Department, gave an additional statement to the police and provided them with consent to collect a DNA sample from her.

[4] Formica testified at trial that he saw "signs of [a] struggle in the [victim's] bedroom." In particular, there was "broken glass" from a "knickknack" and the room looked "messy," "like a struggle had taken place" there.

the state forensic laboratory for DNA testing. The nightgown worn by the victim at the time of the incident also was packaged and sent directly to the state forensic laboratory for testing. The victim's injuries were attended to by paramedics at the scene.

Two days later, on April 12, 2019, the police received a call from the victim and responded to her apartment. Paul Prusinski, a patrol officer with the New Haven Police Department, was one of the responding officers. Upon his arrival, the victim handed him medical documents that she had found while cleaning her bedroom. The documents included prescriptions for ibuprofen and amoxicillin written by a medical provider located at 454 Main Avenue in Norwalk, dated April 10, 2019, and addressed to "Larry Makins," who was listed as having a date of birth of October 31, 1987. Also included was a document with postoperative instructions from Advanced Dental Center, a medical provider located at 454 Main Avenue in Norwalk. The victim told the police that after finding these documents, she or a family member performed an Internet search of the name on the prescriptions and found an image resembling her assailant.

Later that week, the victim contacted the police again, as she believed that the doorknob to her apartment had been tampered with by the defendant. Ryan Hall, a patrol officer with the New Haven Police Department, responded to the scene and observed that the doorknob "was bent downwards." He followed up with his supervisor about how to proceed and was informed that no further investigation would be conducted. Before leaving, Hall photographed the doorknob.

On April 18, 2019, the police brought the defendant to the police station for questioning. The defendant was informed of his *Miranda*[5] rights, which he subsequently

---

[5] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

waived. Throughout the interview, the defendant made a number of statements that included details matching the events that occurred in this case and corroborated the victim's account. First, he admitted that he had gone to a dentist's office in Norwalk on the morning of the offense, that he had received prescription paperwork during that visit, and that he had returned to New Haven around 7 p.m. that evening before the crime was committed. Second, he admitted that he entered a woman's apartment because the door was unlocked and stated that she was "there . . . for me to take advantage of her like a rapist would take advantage of somebody." Third, he described having engaged in a physical altercation with the woman and stated that she was screaming the entire time. Fourth, he stated that the woman asked him for a drink of water and that he got her a bottle of water. Finally, he stated that he returned to the woman's apartment sometime later because he wanted to speak with the woman about what had happened.[6]

On May 14, 2019, the defendant was arrested and, subsequently, was charged in a substitute information with attempt to commit sexual assault in the first degree in violation of §§ 53a-49 (a) (2) and 53a-70 (a) (1) and burglary in the first degree in violation of § 53a-101 (a) (3). Following the defendant's arrest, a buccal swab was taken from the inside of his cheek and sent to the state forensic laboratory for DNA testing. A jury trial followed, at which the state presented testimony from the victim; Bennett; numerous law enforcement officers, including DiAnge, Prusinski, Hall, and Formica; and personnel from the state forensic laboratory.

---

[6] During the interview, the defendant took out a burnt crack pipe and proclaimed that it was his "magic wand." He stated that he used the pipe to create doors, buildings and structures, and rivers, among other things. Further, he claimed to be a fallen angel and part of the Illuminati. The defendant explained during the interview that he used the pipe to create the door that he walked through when he entered the victim's apartment on April 10, 2019, and that he has not yet fully grasped the nature of his "powers."

In particular, the victim testified about the details of her physical altercation with the perpetrator and provided a description of the assailant. Many of those details were corroborated by Bennett's testimony, as well as by law enforcement officers who had responded to the crime scene and taken photographs, which showed that a shattered glass statue was on the floor of the victim's bedroom, that a small dresser was strewn on the floor, and that a case of water bottles was on the edge of the victim's bed. The victim also testified that she got a "clear look" at the perpetrator during the incident and that a photograph resembling the perpetrator appeared when she conducted an Internet search of the defendant's name.[7]

The state also introduced two DNA reports during its direct examination of Frances Rue, a state forensic science examiner. Those reports included the results of Rue's analyses of the samples taken from the crime scene, as well as a sample from the defendant, and were admitted into evidence as full exhibits without objection. Rue testified about her conclusions in those reports. Specifically, Rue explained that the swabs of the bloodlike smear on the victim's left forearm and thumb area yielded DNA profiles that each contained

---

[7] On appeal, the defendant asserts that the victim's identification of him was improper as a result of the state's failure to use an "objective, nonsuggestive method [of identification], such as a photo[graphic] array or lineup" to verify the victim's identification of the defendant. The defendant did not object at trial to the victim's testimony about her Internet search that produced a picture resembling the defendant and has not claimed on appeal that the admission of that testimony constituted error that requires that the judgment be reversed. Instead, his claim is that the victim's testimony regarding the defendant's resemblance to the picture she found on the Internet was insufficient to prove beyond a reasonable doubt that the defendant was her assailant. As set forth in this opinion, we do not conduct a sufficiency analysis by reviewing each piece of evidence in isolation but, instead, review the totality of the evidence to determine whether, viewing the evidence in the light most favorable to sustaining the verdict, the jury reasonably could have concluded that the defendant was guilty.

a mixture of two persons, at least one of whom was male. Rue testified further that she concluded from her DNA analysis, after assuming that the victim was one of the two contributors, that the DNA profile from each sample was "at least 100 billion times more likely to occur if it originated from [the defendant] and [the victim] than if it originated from [the victim] and an unknown individual."[8] Rue also testified regarding her DNA analyses of samples that were collected from the exterior front and exterior back of the nightgown that the victim was wearing during the incident, as reflected in the supplemental DNA report she prepared, which had been admitted into evidence as an exhibit. With respect to two of those samples, the defendant could not be eliminated as a contributor. Moreover, as the supplemental DNA report shows, with respect to one sample collected from the exterior front of the nightgown, which yielded a DNA profile containing a mixture of three contributors, at least one of whom was male, Rue concluded from the DNA analysis, after assuming that the victim was one of three contributors, that the DNA profile was "at least 100 billion times more likely to occur if it originated from [the defendant] and [the victim] and one unknown individual than if it originated from [the victim] and two unknown individuals." As to one of the samples collected from the exterior back of

---

[8] We note that "DNA evidence consists of two elements: (1) a determination that the defendant's genetic profile matches a genetic profile present in the evidentiary sample, and (2) a statistical calculation of the rarity of that match. See, e.g., *State* v. *Sivri*, 231 Conn. 115, 155, 646 A.2d 169 (1994) (explaining that calculation of rarity of match generates a ratio which accompanies a match in order to express the statistical likelihood that an unrelated individual chosen at random from a particular population could have the same DNA profile as the suspect . . .). This is because a match means little without statistical evidence that will allow the fact finder to determine the strength of the match and, thus, the strength of the inferential fact that the defendant is the person whose DNA is present in the actual evidentiary sample." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 337 Conn. 175, 190, 252 A.3d 811 (2020).

the nightgown, which yielded a DNA profile containing a mixture of four contributors, at least one of whom was male, Rue concluded from the DNA analysis, after assuming that the victim was one of four contributors, that the DNA profile was "at least 100 billion times more likely to occur if it originated from [the defendant] and [the victim] and two unknown individuals than if it originated from [the victim] and three unknown individuals."

Additionally, the medical documents bearing the defendant's name and date of birth that were found in the victim's apartment were admitted into evidence, and a video of the police interview of the defendant that took place on April 18, 2019, which had been admitted into evidence without objection, was played for the jury. On April 18, 2023, after the state rested its case, defense counsel orally moved for a judgment of acquittal, asserting that the state had failed to present sufficient evidence to establish, inter alia, the defendant's identity as the perpetrator of the crimes beyond a reasonable doubt. After hearing a brief comment from the prosecutor, the court denied the motion, stating: "The court has reviewed the evidence as to each count. Obviously, the credibility to be afforded all of the witnesses who have testified on behalf of the state is up to the jury. The court, having listened to the evidence, is satisfied that based upon all the evidence that has been presented, both direct and circumstantial, and [the] reasonable and logical inferences therefrom, that such evidence if credited by a jury would reasonably permit a finding of guilt with respect to each count. So, the motion for judgment of acquittal is denied."

Thereafter, the defendant's counsel rested his case without presenting any evidence, and, on April 19, 2023, the case was submitted to the jury, which returned a verdict that day finding the defendant guilty of both counts. On April 21, 2023, the defendant filed a written

motion for a judgment of acquittal, again asserting that the evidence was insufficient to establish his identity as the perpetrator. On June 27, 2023, the court orally denied the motion "for the reasons [it] articulated when [the motion] was addressed during the course of the trial," and it sentenced the defendant to a total effective sentence of forty years of incarceration, execution suspended after thirty years, two of which were a statutory mandatory minimum, followed by fifteen years of probation. It also ordered the defendant to register as a sexual offender for life. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the defendant claims that the court improperly denied his motion for a judgment of acquittal made at the close of all of the evidence because the evidence was insufficient to establish his identity as the perpetrator of the crimes beyond a reasonable doubt. Specifically, the defendant claims that no reasonable juror could have found him guilty beyond a reasonable doubt given (1) the lack of eyewitnesses, (2) the limited physical evidence, and (3) his unreliable statements in his interview with the police. See footnote 6 of this opinion. We disagree.

We begin with our standard of review and the relevant legal principles that guide our analysis of the defendant's sufficiency of the evidence challenge. "It is black letter law that in any criminal prosecution, the state bears the burden of proving beyond a reasonable doubt the defendant's identity as . . . the [perpetrator] of the crime charged." (Internal quotation marks omitted.) *State* v. *Jackson*, 179 Conn. App. 40, 47, 177 A.3d 1190 (2017), cert. denied, 328 Conn. 910, 178 A.3d 1041 (2018). "[T]he question of identity of a perpetrator of a crime is a question of fact that is within the sole province of the jury to resolve." (Internal quotation

marks omitted.) *State* v. *Honsch*, 349 Conn. 783, 811, 322 A.3d 1019 (2024).

"As this court has observed, [a] defendant who asserts an insufficiency of evidence claim bears an arduous burden." (Internal quotation marks omitted.) *State* v. *Purvis*, 227 Conn. App. 188, 193, 321 A.3d 1158, cert. denied, 350 Conn. 922, 325 A.3d 1093 (2024). Our Supreme Court has explained: "To determine whether the evidence was sufficient to establish the essential element of identity, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom, the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . In doing so, we are mindful that the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Abraham*, 343 Conn. 470, 476, 274 A.3d 849 (2022). In addition, we "must focus on the evidence presented, not the evidence that the state failed to present . . . . [Appellate courts] do not draw a distinction between direct and circumstantial evidence so far as probative force is concerned . . . . Indeed, [c]ircumstantial evidence . . . may be more certain, satisfying and persuasive than direct evidence. . . . It is not one fact . . . but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence." (Citations omitted; internal quotation marks omitted.) Id., 477.

We have "often noted [that] proof beyond a reasonable doubt does not mean proof beyond all possible

doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Marcu*, 230 Conn. App. 286, 292, 329 A.3d 1033, cert. denied, 351 Conn. 915, A.3d (2025); see also *State* v. *Morgan*, 274 Conn. 790, 802, 877 A.2d 739 (2005) ("[I]t is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. . . . It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness . . . and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." (Citations omitted.)); *State* v. *Kyle A.*, 212 Conn. App. 239, 246, 274 A.3d 896 (2022) ("We do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. We have not had the [fact finder's] opportunity to observe the conduct, demeanor, and attitude of the witnesses and to gauge their credibility. . . . We are content to rely on the [fact finder's] good sense and judgment." (Internal quotation marks omitted.)), aff'd, 348 Conn. 437, 307 A.3d 249 (2024).

We conclude that the state presented sufficient evidence from which the jury could have found beyond a reasonable doubt that the defendant was the person who entered the victim's apartment, engaged in the physical altercation with the victim, and attempted to sexually assault her. The record includes testimony from the victim about the details of her physical altercation with the perpetrator. Many of those details were

corroborated by Bennett and the law enforcement officers who had responded to the crime scene and testified at trial. For example, Formica testified at trial that he saw signs of a struggle in the victim's bedroom, and the photographs taken by him of the crime scene, which were admitted into evidence, show shattered glass on the victim's bedroom floor, a small dresser that was on the floor, and a case of water bottles on the victim's bed, all of which is consistent with the victim's account of the incident. Furthermore, the victim testified that she got a "clear look" at the perpetrator during the incident and that, when she conducted an Internet search of the defendant's name from prescription paperwork she had found, a photograph appeared that resembled the perpetrator. "It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness; see *Zarembski* v. *Three Lakes Park, Inc.*, 177 Conn. 603, 608, 419 A.2d 339 (1979); and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." *State* v. *Morgan*, supra, 274 Conn. 802. It was therefore within the sole province of the jury to assess the credibility of the testimony of the victim and other witnesses and to determine what weight to afford it.

In addition, the record contains DNA evidence linking the defendant to the crime scene and the physical altercation with the victim. In particular, following the altercation with the perpetrator, swabs taken of a bloodlike smear on the victim's left forearm and thumb area were tested by Rue, a state forensic examiner, who determined that they contained DNA profiles that each contained a mixture of two contributors, at least one of whom was male. The defendant was included as a contributor to the DNA profiles. In fact, Rue concluded, as to each sample, after assuming that the victim was one of the two contributors, that the DNA profile was "100 billion times more likely to occur if it originated from

[the defendant] and [the victim] than if it originated from [the victim] and an unknown individual."[9] Rue reached similar conclusions with respect to samples taken from the front and back exterior of the victim's nightgown.

The evidence presented also included the prescription paperwork from a dental office in Norwalk that contained the name and date of birth of the defendant,

---

[9] In his appellate reply brief, the defendant asserts for the first time that "the DNA evidence in this case was utterly insufficient to establish the defendant's identity as the perpetrator . . . ." In support of this assertion, he raises two claims. First, he claims that "[t]he statistical DNA evidence attributing the bloodlike substance to the defendant was based on [Rue's] unsupported assumption that the victim was a contributor to the DNA samples." Specifically, he asserts that "Rue offered no evidence as to the scientific soundness of that assumption," never explained why the assumption was "scientifically sound," and, thereby, foreclosed the jury from considering an alternative scenario. The second claim raised in his reply brief is that "[t]he likelihood ratios, which were based on Bayes' Theorem, cannot prove [his] guilt under binding Supreme Court precedent." Although the defendant challenged the DNA evidence in his principal appellate brief, he did so on sufficiency grounds, namely, by asserting that the *weight* of the DNA evidence was insufficient to establish his identity as the perpetrator. The claims raised in his reply brief, although framed as relating to sufficiency, relate to the *admissibility* of the DNA evidence. In that respect, we note that the DNA reports containing Rue's analyses of the samples were admitted into evidence without objection. Also, the defendant did not object to or raise any issue at trial with respect to Rue's testimony, especially concerning her assumption that the victim was a contributor to the DNA samples and the methods she used in reaching her conclusions, and he did not request a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 80–90, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), for a determination concerning the reliability of the methods used by Rue to reach her conclusions regarding the DNA evidence. See *Weaver* v. *McKnight*, 313 Conn. 393, 415–16, 97 A.3d 920 (2014) ("[t]he failure to raise a *Porter* claim in the trial court results in waiver of that claim and it will not be considered for the first time on appeal"). Furthermore, because these evidentiary challenges were not raised at trial, the state had no opportunity to respond to them, and we have no basis to consider the scientific soundness of Rue's analysis. Finally, because these claims have been raised for the first time in the defendant's appellate reply brief, we decline to review them. See *State* v. *Griffin*, 217 Conn. App. 358, 375 n.9, 288 A.3d 653 ("it is well established that we do not entertain arguments raised for the first time in a reply brief"), cert. denied, 346 Conn. 917, 290 A.3d 799 (2023).

which the victim had discovered in her bedroom a few days after the incident.[10] The defendant acknowledged during his videorecorded interview with the police that he had visited a dentist's office in Norwalk on the day of the incident and received prescription paperwork during that visit. The jury thus reasonably could have inferred that the defendant dropped the paperwork during his physical altercation with the victim in her bedroom. See *State* v. *Patrick M.*, 344 Conn. 565, 576, 280 A.3d 461 (2022) ("[t]he jury is permitted to rely on its common sense, experience and knowledge of human nature in drawing inferences . . . and may draw factual inferences on the basis of already inferred facts" (internal quotation marks omitted)).

Additionally, throughout his police interview, the defendant made a number of incriminating statements and recounted details of the incident that not only corroborated the victim's account but also related to information that only the perpetrator would have known. For example, in addition to the dental office visit and the prescription paperwork bearing his name, the defendant admitted that he had entered a woman's apartment because the door was unlocked. He described having engaged in a physical altercation with the woman, who was screaming the entire time and had asked him for a drink of water, to which he obliged. Finally, he acknowledged that he returned to the woman's apartment sometime later because he wanted to speak with the woman about what had happened. It was entirely reasonable for the jury to have inferred that the circumstances recounted by the defendant and the physical altercation that the victim reported as occurring in the victim's bedroom on April 10, 2019, were one and the same. Accordingly, we agree with the state that the

---

[10] When questioned at trial if she had ever heard the name of the person from the paperwork, the victim testified: "Nope. Never seen him a day in my life." She also testified that she did not know who the person was.

cumulative effect of the evidence, along with the inferences that the jury reasonably could have drawn therefrom, was more than sufficient to establish beyond a reasonable doubt the defendant's identity as the perpetrator.

Notwithstanding this evidence, as we stated previously in this opinion, the defendant raises three grounds in support of his claim that the evidence was insufficient to establish his identity as the perpetrator. The first ground concerns the lack of eyewitnesses. Specifically, the defendant asserts that "[t]he state failed to produce any eyewitnesses who could testify that the defendant was the intruder who committed the charged offenses" and that, "[w]ithout a positive identification of the intruder, no reasonable juror could conclude that the man's identity was proven beyond a reasonable doubt."[11] The defendant, however, has provided no authority to support the assertion that identity must be established by way of eyewitness testimony.

---

[11] We note that, although the victim did not make an identification of the defendant as the perpetrator by way of a lineup or photographic array, in her testimony at trial she provided a general description of the perpetrator as a tall and dark skinned male, with an approximate height of five feet, nine inches, to five feet, ten inches, with "fuzz on his chin," wearing blue jeans and a black hoodie. She also testified that, after she found papers bearing the defendant's name in her bedroom, she conducted a search for the name using Google, and a picture associated with the name appeared that resembled the perpetrator, although that picture was never introduced into evidence. The state asserts that the victim's testimony constitutes eyewitness identification evidence, which the defendant has ignored. The defendant argues on appeal that the victim's testimony to that effect was unreliable and that her "identification" of the defendant resulted from an impermissibly suggestive procedure, although the defendant never challenged the admissibility of that testimony at trial. As we have stated in this opinion, the defendant's challenge to the reliability of the victim's "identification" testimony has been raised for the first time on appeal and, thus, we decline to review it. See footnote 7 of this opinion. Moreover, in light of our determination that eyewitness identification evidence is not required to establish identity and that the cumulative effect of the circumstantial evidence submitted at trial was sufficient to establish the defendant's identity as the perpetrator to support the verdict, we need not address this issue further.

The state counters, and we agree, that eyewitness testimony is not required to establish identity.

In *State* v. *Honsch*, supra, 349 Conn. 783, the defendant similarly raised on appeal a claim that the evidence was insufficient to establish his identity as the perpetrator of a murder. Id., 786. In *Honsch*, the state presented circumstantial evidence that included fingerprint evidence and consciousness of guilt evidence consisting of statements made by the defendant as well as evidence of his flight to Africa following the murder, all of which our Supreme Court determined was "more than sufficient to establish the defendant's identity as the person who murdered the victim." Id., 812. Notably, despite the absence of eyewitness identification evidence in *Honsch*, our Supreme Court determined that the circumstantial evidence presented was sufficient to support the defendant's identity as the person who committed the murder.

Similarly, in *State* v. *Patrick M.*, supra, 344 Conn. 565, our Supreme Court, after recognizing "that there was no direct evidence, such as eyewitness testimony, or physical evidence, such as DNA, linking the defendant" to the murder of his wife; id., 577; nonetheless concluded that "the cumulative impact of the circumstantial evidence was sufficient to satisfy the state's burden of proving beyond a reasonable doubt that it was the defendant who murdered [his wife] with a firearm." Id., 578. As the court explained, the absence of direct evidence such as eyewitness testimony "does not preclude a finding of guilt on the basis of circumstantial evidence that satisfies the constitutional standard"; id., 577; especially given that courts "do not draw a distinction between direct and circumstantial evidence so far as probative force is concerned . . . ." (Internal quotation marks omitted.) Id.

Indeed, there is an abundance of case law in Connecticut demonstrating that a perpetrator's identity may be

established beyond a reasonable doubt without eyewitness identification evidence. See *State* v. *Abraham*, supra, 343 Conn. 476 (finding sufficient evidence to support conviction even though no eyewitnesses identified defendant as perpetrator); *State* v. *Farnum*, 275 Conn. 26, 36–37, 878 A.2d 1095 (2005) (rejecting contention that, because no witness was able to identify defendant as robber, evidence was insufficient to support conviction, as circumstantial evidence was sufficient to establish defendant's identity as perpetrator); *State* v. *Hazard*, 201 Conn. App. 46, 55–56, 65, 240 A.3d 749 (there was sufficient evidence from which jury reasonably could have found beyond reasonable doubt that defendant was person who robbed storage facility even though no eyewitness identified him as perpetrator), cert. denied, 336 Conn. 901, 242 A.3d 711 (2020); *State* v. *Reddick*, 153 Conn. App. 69, 76, 100 A.3d 439 ("notwithstanding [witness'] inability to conclusively identity the defendant as the perpetrator, the jury reasonably could have inferred [that he was] from the totality of the evidence"), cert. dismissed, 314 Conn. 934, 102 A.3d 85 (2014), and cert. denied, 315 Conn. 904, 104 A.3d 757 (2014); *State* v. *James*, 141 Conn. App. 124, 130, 60 A.3d 1011 ("[a]lthough there was no direct, eyewitness testimony placing the defendant at the crime staging area, at the shooting itself, in the vehicle that fled from the shooting or at the site where that vehicle was abandoned, we nevertheless [conclude] that there was sufficient circumstantial evidence from which the jury reasonably and permissibly could have inferred that the defendant was one of the perpetrators of the shooting and, thus, guilty of the crimes charged"), cert. denied, 308 Conn. 932, 64 A.3d 331 (2013). Accordingly, the defendant's claim that, without a positive identification made by an eyewitness, no juror could have concluded beyond a reasonable doubt that he was the perpetrator necessarily fails.

Next, the defendant claims that the evidence was insufficient because there was limited physical evidence that tied him to the crimes.[12] Specifically, he argues that the DNA evidence was insufficient to prove his identity as the perpetrator and to sustain his conviction because it was "limited and inconclusive," in that it established only that he "could be" included as a contributor. (Emphasis omitted.) He also asserts that, "[a]lthough [his] DNA was found on the [victim's] arm and hand, there is no method for determining how DNA ends up on an item." In this regard, he suggests that it could have been deposited via a secondary transfer in which the DNA is "transferred from the original source to an item that then comes into contact with a second item or individual." We are not persuaded.

First, the victim's testimony provided the jury with an explanation of why the defendant's DNA was found on her, and it was within the province of the jury to find her explanation credible.[13] See *State* v. *Fleming,*

---

[12] In his principal appellate brief, the defendant also suggests that law enforcement failed to thoroughly investigate the crime scene. In support of this assertion, he directs this court's attention to the facts that no fingerprint evidence was gathered, no blood was detected on the bedsheets and water bottles, despite the victim's assertion that she struck the perpetrator in the head with a glass object that shattered, and certain of the swabs taken from the crime scene had not been sent to the state forensic laboratory for processing. We conclude that these claimed inadequacies in the investigation do not undermine the sufficiency of the evidence that was submitted at trial. As we stated previously in his opinion, in assessing the sufficiency of the evidence, "we must focus on the evidence presented, not the evidence that the state failed to present . . . ." (Internal quotation marks omitted.) *State* v. *Abraham,* supra, 343 Conn. 477.

[13] Specifically, the victim testified that she had engaged in a physical altercation with the perpetrator. During that altercation, the perpetrator attempted to hold the victim down on her bed, but she struggled and started punching him in an attempt to fight him off. When that was unsuccessful, she grabbed a glass statue that was by her bedside and hit the perpetrator over the head with it, causing it to shatter. According to the victim's testimony, during this incident the perpetrator pulled down his pants and underwear and exposed his penis, which she grabbed and held onto, causing the perpetrator to put her in a chokehold. In light of this testimony, the jury

111 Conn. App. 337, 345, 958 A.2d 1271 (2008) ("[I]t is fully within the province of the jury to determine what weight . . . testimony is afforded. [W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.)), cert. denied, 290 Conn. 903, 962 A.2d 794 (2009). Moreover, even if there were an alternative reasonable inference as to how the defendant's DNA became deposited on the victim, as we discussed previously in this opinion, the jury "is not required to accept as dispositive those inferences that are consistent with the defendant's innocence." (Internal quotation marks omitted.) *State* v. *Patrick M.*, supra, 344 Conn. 575.

Second, the defendant's contention that the presence of his DNA on the victim, alone, is not dispositive of his identity as the perpetrator[14] ignores the fact that the jury had before it substantial circumstantial evidence in addition to the DNA evidence. Indeed, as we have noted in this opinion, we "do not draw a distinction between direct and circumstantial evidence so far as probative force is concerned"; (internal quotation marks omitted) *State* v. *Abraham*, supra, 343 Conn. 477;

reasonably could have inferred that the defendant deposited his DNA on the victim during the physical altercation.

[14] We also note that the defendant's contention fails to recognize the compelling nature of the DNA evidence. See *State* v. *Smith*, 280 Conn. 285, 309, 907 A.2d 73 (2006) ("persuasive force of DNA evidence cannot be ignored"); *State* v. *Durdek*, 184 Conn. App. 492, 511 n.10, 195 A.3d 388 ("there was compelling and otherwise unexplained DNA evidence that placed the defendant at the scene and in sexual contact with the victim"), cert. denied, 330 Conn. 934, 194 A.3d 1197 (2018); *Jones* v. *Commissioner of Correction*, 169 Conn. App. 405, 413, 150 A.3d 757 (2016) (finding that there was "compelling evidence identifying the petitioner as a contributor to DNA contained within a sample of biological material collected in relation to [a] sexual assault"), cert. denied, 324 Conn. 909, 152 A.3d 1246 (2017); *State* v. *Quail*, 168 Conn. App. 743, 766, 148 A.3d 1092 (recognizing that, "in particular criminal convictions, DNA evidence may be the most compelling evidence of an accused's guilt"), cert. denied, 323 Conn. 938, 151 A.3d 385 (2016).

and, in this case, the jury was presented with both physical evidence and circumstantial evidence of the defendant's guilt, which, taken cumulatively, provided a sufficient basis for the jury's verdict. See *State* v. *Marcu*, supra, 230 Conn. App. 292 ("[i]f it is reasonable and logical for the [fact finder] to conclude that a basic fact or an inferred fact is true, the [fact finder] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt" (internal quotation marks omitted)).

Finally, the defendant claims that the jury could not reasonably have relied on the video of his police interview in concluding that the state had proven identity beyond a reasonable doubt in light of "the magical thinking that he displayed"; see footnote 6 of this opinion; and the fact that he made both inculpatory and exculpatory statements,[15] which he argues precluded the jury from construing his statements as a confession. This claim warrants little discussion.

The video of the police interview of the defendant was admitted into evidence without objection, and on appeal, the defendant has not argued that its admission was improper. Consequently, he cannot now argue that

---

[15] Specifically, the defendant notes that, although he admitted during the police interview that he had gone to a dentist's office on the day of the crime, he also stated in the interview that the woman " 'in the house' " that he entered was " 'Spanish' and was a 'light-skinned Puerto Rican girl,' whereas the complainant in this case is African American." The defendant also points out that, during the interview, "he never mentioned having his penis grabbed by a woman who was trying 'to rip it off' or getting hit hard in the head with a glass sculpture that shattered." Finally, the defendant expresses that most of his statements to the police "focused on his claims to be a member of the Illuminati and to have magic powers that enabled him to walk through doors and windows and 'create' buildings, rivers, streets, cars, and birds." As a result, he asserts that the interview evidence is unreliable.

the video should not have been considered by the jury on the issue of identity. The law is clear that it is within the jury's exclusive province to determine what weight, if any, to afford evidence and to determine the credibility of witnesses. See *State* v. *Rivera*, 187 Conn. App. 813, 841, 204 A.3d 4 (2019), aff'd, 335 Conn. 720, 240 A.3d 1039 (2020). The jury, therefore, was free to determine the credibility of the defendant's statements during the police interview and to consider his inculpatory statements in assessing whether the state met its burden of demonstrating beyond a reasonable doubt the defendant's identity as the perpetrator. "[W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Fleming*, supra, 111 Conn. App. 345. Therefore, it would not have been unreasonable for the jury to find credible certain of the defendant's statements to the police during the interview, especially when, during that interview, the defendant, unprompted, shared facts with the police that only the perpetrator and the victim would have known, such as that the victim had asked for water after the physical altercation, among other things.

In summary, we conclude, on the basis of our review of the record, that the cumulative force of the evidence adduced at trial was sufficient to satisfy the state's burden of proving beyond a reasonable doubt that the defendant was the perpetrator of the burglary and attempted sexual assault of the victim. Accordingly, the defendant's challenge to the sufficiency of the evidence to establish his identity as the perpetrator fails.

The judgment is affirmed.

In this opinion the other judges concurred.